NOTE: This order is nonprecedential.

**FILED**

**Jun 30, 2026**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# United States Court of Appeals
# for the Federal Circuit

---

**SCOTT BENNETT,**
*Petitioner*

**1:26-cv-5029-JLT-FJS**

**v.**

**DEPARTMENT OF THE INTERIOR,**
*Respondent*

---

2026-1289

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-25-0045-I-1.

---

Before PROST, MAYER, and CUNNINGHAM, *Circuit Judges.*

PER CURIAM.

### O R D E R

Scott Bennett filed an appeal at the Merit Systems Protection Board challenging the agency's decision to remove him from federal service. The Board affirmed the agency's decision and found that Mr. Bennett failed to prove his claim of disability discrimination. Mr. Bennett petitions for review, and we directed the parties to show cause because he indicated he continues to pursue that discrimination claim. In response to the court's show cause order, the agency urges dismissal. Mr. Bennett has not responded.

2                                                    BENNETT v. INTERIOR

Federal district courts, not this court, have jurisdiction over "[c]ases of discrimination subject to the provisions of [5 U.S.C. §] 7702," 5 U.S.C. § 7703(b)(2), which involve an allegation of an action appealable to the Board and an allegation that a basis for the action was covered discrimination, § 7702. *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 425–26, 437 (2017). Here, Mr. Bennett alleged that his removal was based, at least in part, on covered discrimination, and continues to pursue that claim, such that his case belongs in district court. Under the circumstances of this case, we find it appropriate to transfer to the United States District Court for the Eastern District of California, where the employment action appears to have occurred, which may address, *inter alia*, any issues concerning timeliness.

Accordingly,

IT IS ORDERED THAT:

This matter and all filings are transferred to the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1631.

FOR THE COURT

June 30, 2026
   Date

Jarrett B. Perlow
Clerk of Court



# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

717 MADISON PLACE, N.W.
WASHINGTON, D.C. 20439

JARRETT B. PERLOW
CLERK OF COURT

CLERK'S OFFICE
202-275-8000

December 29, 2025

## NOTICE OF DOCKETING

**Federal Circuit Docket No.:** 2026-1289

**Federal Circuit Short Caption:** Bennett v. Interior

**Date of Docketing:** December 29, 2025

**Originating Tribunal:** Merit Systems Protection Board

**Originating Case No.:** SF-0752-25-0045-I-1

**Petitioner:** Scott Bennett

A petition for review has been filed and assigned the above Federal Circuit case number. The court's official caption is included as an attachment to this notice. Unless otherwise noted in the court's rules, the assigned docket number and official caption or short caption must be included on all documents filed with this Court. It is the responsibility of all parties to review the Rules for critical due dates. The assigned deputy clerk is noted below and all case questions should be directed to the Case Management section at (202) 275-8055.

**CERTIFIED LIST:** The agency or arbitrator is directed to forward the certified list as promptly as possible but no later than 40 days from the date of this notice.

The following filings are due within 14 days of this notice:

- Entry of Appearance or Notice of Unrepresented Person. (Fed. Cir. R. 47.3.)
- Certificate of Interest. (Fed. Cir. R. 47.4; not required for unrepresented and federal government parties unless disclosing information under Fed. Cir. R. 47.4(a)(6))
- Docketing Statement. Note: The Docketing Statement is due in 30 days if the United States or its officer or agency is a party in the appeal. (Fed. Cir. R. 47.6 and the Mediation Guidelines; no docketing statement is required in cases with an unrepresented party)

- Statement Concerning Discrimination in MSPB or arbitrator cases. (Fed. Cir. R. 15(c); completed by petitioner only)
- Fee payment or appropriate fee waiver request, if the docketing fee was not prepaid (see Fee Payment below).

**FILING DOCUMENTS:** Each counsel representing a party must be a member of the court's bar and registered for the court's electronic filing system. Parties represented by counsel must make all filings through the court's electronic filing system.

Unrepresented parties may choose to submit case filings to the court either in paper or through the court's electronic filing system; electronic filing will only be permitted for unrepresented parties after successful registration for the court's electronic filing system and submission of a completed Notice of Unrepresented Person Appearance. Fed. Cir. R. 25(a). The court's Electronic Filing Procedures may be accessed here.

**CONTACT INFORMATION:** Electronic filers, or unrepresented parties registered to receive electronic service, must update their contact information in their PACER service center profile whenever their contact information changes. Counsel must file an amended Entry of Appearance and unrepresented parties must file an amended Notice of Unrepresented Person Appearance whenever contact information changes. Fed. Cir. R. 25(a)(5).

**FEE PAYMENT:** Unless the filing fee was prepaid, fee payment must be submitted within fourteen days after this notice. Fed. Cir. R. 52(d). For outstanding docketing fees due to this court, electronic filers must pay the fee using the event Pay Docketing Fee through the court's electronic filing system. Fed. Cir. R. 52(e). Docketing fees due to other courts, such as U.S. District Courts, the U.S. Court of Appeals for Veterans Claims, and non-vaccine cases at the U.S. Court of Federal Claims, must be submitted to those courts in accordance with their procedures. A filer wishing to proceed without fee payment must submit a motion for leave to proceed in forma pauperis, or other fee waiver request, within fourteen days.

**OFFICIAL CAPTION:** The court's official caption is attached and reflects the lower tribunal's caption pursuant to Fed. R. App. P. 12(a), 15(a), and 21(a). Please review the caption carefully and promptly advise this court in writing of any improper or inaccurate designations.



Jarrett B. Perlow
Clerk of Court

By: I. Hammer, Deputy Clerk

**Attachments:**

- Official caption
- Paper Copies of General Information and Forms (to unrepresented parties only):
    - General Information and Overview of a Case in the Federal Circuit
    - Notice of Unrepresented Person Appearance
    - Informal Brief
    - Informal Reply Brief (to be completed only after receiving the opposing party's response brief)
    - Motion and Affidavit for Leave to Proceed in Forma Pauperis (only to filers owing the docketing fee)
    - Supplemental in Forma Pauperis Form for Prisoners (only to filers in a correctional institution)
    - Statement Concerning Discrimination (only to petitioners in MSPB or arbitrator case)

**cc:** Merit Systems Protection Board

## Official Caption

**SCOTT BENNETT,**
*Petitioner*

**v.**

**DEPARTMENT OF THE INTERIOR,**
*Respondent*

## Short Caption

Bennett v. Interior

FORM 5. Petition for Review/Notice of Appeal of an Order or Decision of an Agency, Board, Commission, Office, Bureau, or the US Court of Federal Claims (vaccine appeals only))    Form 5
March 2023

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### PETITION FOR REVIEW/NOTICE OF APPEAL

Notice is hereby given that the petitioner(s)/appellant(s) listed below hereby appeal(s) the below-noted case to the United States Court of Appeals for the Federal Circuit.

Originating Tribunal *(Name of Agency, Board, Commission, Office, Bureau, or Court whose decision is being appealed)*:    Merit Systems Protection Board

Case number being appealed:    SF-0752-25-0045-I-1

Case title being appealed:    Scott Bennett (Appellant) v. Dept. of the Interior

Date of final decision or order being appealed:    10/23/2025

Date decision or order was received:    09/18/2025

☑ I have attached a copy of the decision or order being appealed.

**List all Petitioners/Appellants** (List each party filing this appeal. Do not use "et al." or other abbreviations. Attach continuation pages if necessary.)

Scott Bennett

Date: 12/20/2025    Signature: _____

Name: Scott Bennett

Address: 550 Dexter Avenue

Porterville, CA 93257

Phone Number: 207-812-8476

Email Address: ScottB0213@aol.com

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WESTERN REGIONAL OFFICE**

| | |
|---|---|
| SCOTT BENNETT,<br>　　　　　Appellant, | DOCKET NUMBER<br>SF-0752-25-0045-I-1 |
| v. | |
| DEPARTMENT OF THE INTERIOR,<br>　　　　　Agency. | DATE: September 18, 2025 |

Dawn Bennett, Porterville, California, for the appellant.

Gregory James Thornton, Washington, D.C., for the agency.
Julia Zukina, Washington, D.C., for the agency.

**BEFORE**
Cynthia B. De Nardi
Administrative Judge

**INITIAL DECISION**

**INTRODUCTION**

On October 21, 2024, the appellant timely appealed the agency's removal action. Initial Appeal File (IAF), Tab 1. The Board has jurisdiction. 5 U.S.C. §§ 7511-7513, 7701(a). On April 3, 2025, the appeal was reassigned to me. IAF, Tab 42. I held the appellant's requested hearing by video conference in May 2025, and the record closed on May 27, 2025. IAF, Tabs 54-57.[1]

For the reasons discussed below, the agency's action is AFFIRMED.

---

[1] IAF, Tab 54 is the hearing audio for May 7, 2025. IAF, Tab 55 is the hearing audio for May 8, 2025. IAF, Tab 56 is the hearing audio for May 13, 2025. IAF, Tab 57 is the hearing audio for the parties' closing arguments and my closing of the record.

2

## ANALYSIS AND FINDINGS

Background

At the time of his removal, the appellant worked for the agency as an Engineering Equipment Operator Leader, WL-5716-10, with the National Park Services, Division of Maintenance and Construction, duty stationed at the Sequoia and Kings Canyon National Parks (SEKI) in Three Rivers, California. IAF, Tab 5 at 35. The appellant transferred to SEKI in September 2021 after working for about 10 years at Acadia National Park in Maine. IAF, Tab 8 at 24; Tab 56 (Bennett).

At the times relevant to this appeal, the appellant's supervisors at SEKI were Nicholas Heath, Roads Supervisor, Nathan Aldrich, Facility Manager, and Rick Hall, Chief of Facilities and Construction.

Requirements of the appellant's position

An Engineering Equipment Operator Leader operates heavy equipment for the maintenance of the park's roads and parking lots and provides daily direction to a staff to accomplish this work. IAF, Tab 8 at 26. The position requires the incumbent to have a commercial driver's license (CDL), which the appellant had. IAF, Tab 8 at 25 (Position description provides: "Must maintain a valid Class A Commercial Drivers License with air brakes and hazardous materials endorsement."); Tab 54-5 (Hall); Tab 56 (Bennett).

The appellant's position subjects him "to the requirements of the Department of Transportation (DOT) drug and alcohol testing program" and "is a Testing Designated Position (TDP) under the Department of the Interior Drug-Free Workplace Program." IAF, Tab 8 at 25-26. The appellant's appointment document also notes the Engineering Equipment Operator Leader is a "position subject to drug testing." IAF, Tab 8 at 24 (block 45). The appellant did not dispute that having a CDL is a requirement of his position or that the position is subject to random drug testing.

3

<u>The agency's drug test program: Personnel bulletin 17-15</u>

Personnel bulletin 17-15 (PB 17-15) is the Interior Department's policy and guidance for drug and alcohol testing.  IAF, Tab 8 at 39-57 (Drug-Free and Alcohol-Free Workplace Plan).  The following provisions of the policy are relevant to the issues in this appeal:

- A TDP, among others, is one covered by the Omnibus Transportation Employee Testing Act of 1991, which means that the incumbent is subject to [DOT] rules, *e.g.* commercial driver's license holders (CDL).  IAF, Tab 8 at 41 (Section 3.D.6), 55 (endnote ii); Tab 54-1 (Castlelow).
- TDPs are subject to selection for random drug testing.  IAF, Tab 8 at 41, 43-44 (section 6.A).
- An individual selected for random testing will be notified the same day the test is scheduled, preferably within two hours of the scheduled testing.  The individual's supervisor should explain to the employee that he/she is under no suspicion of taking drugs and that the employee's name was selected randomly.  IAF, Tab 8 at 47 (section 14.C).
- Employees who are referred through administrative channels to undergo counseling or rehabilitation programs for illegal drug use will be subject to unannounced testing, both during and after such a program.  IAF, Tab 8 at 44 (section 6.E).
- The agency authorizes a direct observed collection when a donor's previous drug test result was reported by the [Medical Review Officer] as drug positive, adulterated, substituted, invalid without a legitimate medical reason or cancelled because the split specimen failed to reconfirm the primary specimen results or could not be tested.  IAF, Tab 8 at 45 (section 9.A).
- At the collection site, an immediate collection of a second urine sample is required in one of the following situations: (1) The temperature of the specimen collected during a routine collection is outside the acceptable temperature range [ . . .].  IAF, Tab 8 at 45 (section 9.B(1)).
- Failure to appear for testing without a deferral will be considered refusal to participate in testing.  Employees may be subjected to the full range of disciplinary actions, including removal from Federal service, if they refuse to be tested.  If the employee is not removed, he or she will be referred to the [Employee Assistance Program] and required to submit to follow-up testing.  IAF, Tab 8 at 46 (section 10).

4

- Mandatory Administrative Action. The agency shall refer an employee found to use/possess illegal drugs or to use/possess alcohol on duty to the [Employee Assistance Program/Substance Abuse Program]. Employees found to use/possess illegal drugs or to use/possess alcohol on duty (for employees covered by the Omnibus Transportation Employee Testing Act of 1991) will not be allowed to remain on duty in a TDP until successful completion of a rehabilitation program through EAP/SAP. At the discretion of DOI, and as part of an EAP rehabilitation program, an employee may return to duty in a TDP if the employee's return would not endanger public health or safety or national security.  IAF, Tab 8 at 50 (section 18.B).
- Employees referred through administrative channels who undergo a counseling or rehabilitation program for illegal drug use through the EAP or SAP will be subject to unannounced testing for 1 year; a return-to-duty test is required for any employee in a position covered by the Omnibus Transportation Employee Testing Act of 1991.  IAF, Tab 8 at 49-50 (section 17.B).
- A refusal to take a drug or alcohol test when required includes "[a]ttempts to alter or substitute the specimen provided."  IAF, Tab 8 at 51 (section 18.E(3)).

The policy defines "illegal drugs" as both Schedule I and Schedule II controlled substances, which includes marijuana.  IAF, Tab 8 at 40, 41 (sections 3.B, 4.B(3)).  In this decision, marijuana is also referred to as "THC" which denotes the main active compound in the cannabis or marijuana plant.[2]

The random drug test in September 2022.

On September 13, 2022, six SEKI employees, including the appellant, were randomly selected for drug testing.  IAF, Tab 8 at 20.  The appellant's direct supervisor, Nicholas Heath, told him to report to the testing facility on September 27, 2022 for a random drug test.  IAF, Tab 54-2 (Heath); Tab 56 (Bennett).[3]

---

[2]  https://www.mayoclinic.org/drugs-supplements-marijuana/art-20364974 (last viewed September 17, 2025).

[3]  Testimony about what else Heath may have told Bennett in advance of the random drug test is disputed.  Bennett testified that Heath gave him specific advice for how to cheat the drug test, which he followed; Heath denied Bennett's account.  Whether Heath advised the appellant on how to cheat the drug test, including where to buy synthetic

The appellant reported to the drug testing facility on September 27, 2022. He provided a urine sample that could not be tested because it was not in the allowable temperature range.  As dictated by the agency's Drug-Free Workplace policy, when the temperature of the specimen collected during a routine collection is outside the acceptable temperature range, an immediate collection of a second urine sample is required.  IAF, Tab 8 at 45.

The collector informed the appellant he would have to provide a viable urine specimen under observed conditions and had to remain at the testing facility for up to three hours in order to provide the specimen.  IAF, Tab 8 at 19.  But then the appellant showed the collector that he had a bag of urine strapped to his thigh:

> Upon observation, [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19 (the collector's statement).

The collector left Aldrich two voicemail messages about (1) the need to conduct a second, observed collection from the appellant due to a "non-temp" and (2) why the result of the second, observed collection was a "refusal to test."  The voicemails were forwarded to Hall who provided them to Supervisory Drug Program Specialist Bryan Castelow and Elisha Harris in Human Resources.  IAF, Tab 52-53 (voicemail messages); Tab 54-5 (Hall).

The appellant testified consistently with the collector's documented observation; that is, he admitted that he showed the collector the bag of urine strapped to his leg and admitted that he was trying to cheat the drug test.  The appellant recalled that the collector was "disappointed."  IAF, Tab 56 (Bennett). Although the appellant offered to stay at the testing facility until he could provide

---

urine to pass off as his own, is not material to my determining whether the agency proved the charged misconduct.  For this reason, I will not decide which witness testified more credibly on this topic, although I found, overall, the appellant a very credible witness.

his own urine for a second drug test, the collector told him he could leave and return to work. *Id*. The appellant returned to work and told Heath what happened.[4] IAF, Tab 56 (Bennett).

It is undisputed that the drug testing policy defines a refusal to test to include a situation where an employee is either unwilling or unable to provide a second specimen, or where an employee attempts to alter or substitute a urine sample. IAF, Tab 54-1 (Castelow); Tab 8 at 51 (section E).

Castelow advised Hall to restrict the appellant from safety sensitive duties and initiate some type of disciplinary proceedings. IAF, Tab 8 at 15-16. According to Hall, Castelow also advised that if management wanted to retain the appellant, he would have to complete a substance abuse program. IAF, Tab 54-5 (Hall).

The appellant's October 2022 meeting with Aldrich.

The appellant's first and second line supervisors, Heath and Aldrich, met with him on October 3, 2022, about the "refusal to test." IAF, Tab 54-3 (Aldrich); Tab 56 (Bennett). The appellant admitted that he tried to cheat the random drug test. The appellant also admitted that he had used marijuana since becoming a SEKI employee, but never while at work. *Id*. The appellant acknowledged that Aldrich and Heath told him he could not operate equipment that required a Class A CDL. IAF, Tab 56 (Bennett). There is a dispute over whether the supervisors explicitly told the appellant that he was restricted from performing "safety sensitive" duties until further notice or provided him a list of the "safety sensitive" duties from which he was restricted. *See* IAF, Tab 56 (Bennett). This distinction, however, is not material to the issues I must adjudicate in this appeal.

---

[4] The appellant testified that Heath asked him if he had the air conditioner on when he drove to the testing facility, and when the appellant said "yes," Heath responded, "that's where you went wrong." IAF, Tab 56 (Bennett).

Case: 26-1289   Document: 1-2   Page: 8   Filed: 12/29/2025   (14 of 153)
Case 1:26-cv-05029-JLT-FJS   Document 1   Filed 06/30/26   Page 14 of 153

7

Finally, Aldrich informed the appellant that if he failed to complete a substance abuse program (SAP) he could face serious discipline, including removal from his position.  They discussed a program that Aldrich personally recommended, Recovery Resources, located in Visalia, CA.  IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

The appellant's November 2022 meeting with Aldrich and Hall.

The appellant met with his second and third line supervisors, Aldrich and Hall, in November 2022 to discuss what the appellant believed was workplace misconduct by first line supervisor, Heath.  IAF, Tab 54-3 (Aldrich); Tab 54-5 (Hall); Tab 56 (Bennett); *see also* Tab 45 at 115.  Aldrich took notes at the meeting but also asked the appellant to put his complaint in writing so he could look into it.  *See* IAF, Tab 7 at 260.  Aldrich testified consistently with his notes that the appellant reported Heath smoked marijuana at work, asked the appellant to smoke marijuana with him at work, and suggested the appellant use synthetic urine to cheat the random drug test and told him where he could buy it.[5]  *Id.*; *see also* IAF, Tab 45 at 115-16.  The appellant also reported that Heath harassed and micromanaged other members of the crew and may have misused a government credit card.  IAF, Tab 7 at 24-25.

During this meeting, the appellant also told Aldrich that his vision was deteriorating and that he had a "near crash" while driving to work.[6]  The appellant

---

[5] Heath denied smoking marijuana with or in front of the appellant or encouraging him to smoke it for medical reasons.  IAF, Tab 54-2 (Heath).  Whether or not the appellant's disclosure about Heath using illegal drugs is true is not material to any of the issues I must decide in this appeal.  For this reason, I will not decide which witness testified more credibly, although as I noted above, I found the appellant to be overall a very credible witness.

[6] The appellant testified that he was on approved leave from July 4-August 21, 2022, while he sought treatment from specialists after he had a "near miss" while driving.  IAF, Tab 56 (Bennett).  It is unclear whether the "near crash" the appellant told Aldrich about was the same as the "near miss" that preceded his medical leave in the summer of 2022. However, by November 2022, the appellant's vision condition was indisputably interfering with his ability to drive safely.

8

was worried about whether he would be able to keep his Class A CDL.  IAF, Tab 54 (Aldrich); Tab 56 (Bennett).  Aldrich testified that he told the appellant that once the appellant completed the SAP, they could discuss other positions at SEKI for him that did not require a CDL.  IAF, Tab 54 (Aldrich).  The appellant testified that Aldrich suggested the possibilityy of other positions at SEKI for him that did not require a CDL.  IAF, Tab 56 (Bennett).

November 2022 – February 2023 – the appellant and the Substance Abuse Program.

The appellant started attending an intensive outpatient program (IOP) at Recovery Resources on October 18, 2022.  IAF, Tab 8 at 6; Tab 56 (Bennett).

Starting in December 2022, Aldrich asked the appellant several times for a status update on his participation in a SAP.  IAF, Tab 8 at 13; Tab 54 (Aldrich).  Aldrich understood from the appellant that he was participating in a SAP one day a week.  IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

By letter dated February 14, 2023, Aldrich asked the appellant to respond and provide documentation, and also informed the appellant:

> Please note, you currently occupy a position which has duties classified as DOT safety-sensitive duties. In order to perform these safety-sensitive duties you must receive an SAP evaluation and successfully comply with the SAP's evaluation recommendations. Therefore, you will not be authorized to return to safety-sensitive duties until the SAP return-to-duty process is successfully completed.

IAF, Tab 8 at 13.

Thus, as of the February 14, 2023, letter to the appellant, Aldrich had no evidence that the appellant had either participated in or completed a SAP.  IAF, Tab 54 (Aldrich). On February 20, 2023, the appellant responded to Aldrich.  He declined to provide SAP documentation until Aldrich provided him with evidence that he was facing disciplinary action and had agreed to participate in a SAP. However, the appellant offered to submit to an observed urine test any time. The

9

appellant's view was that he never refused to submit to a drug test but that the collector refused to test him.  IAF, Tab 8 at 8-9.

February 2023 – EEO and Inspector General complaints.

On February 15, 2023, the appellant sought equal employment opportunity (EEO) counseling, alleging in part that he had been denied reasonable accommodation since August 2022.  IAF, Tab 5 at 25.  He filed a formal EEO complaint in May 2023 which included the failure to accommodate claim.  *Id*. at 26-27.

On the same date, the appellant submitted two complaints to the Department of Interior's Inspector General (IG) about supervisory misconduct.[7] IAF, Tab 44 at 39-45.  The Department of Interior notified the appellant that it referred his redacted complaints to the National Park Service.  *Id*. at 46.

The appellant's medical conditions.

At all times relevant to this appeal, the appellant had two primary medical conditions: joint pain caused by aggressive inflammatory arthritis and vision problems caused by glaucoma and pigment dispersion syndrome.  IAF, Tab 7 at 93-94; Tab 56 (Bennett).  The appellant moved to California because the climate would be more favorable for his arthritis symptoms.  IAF, Tab 56 (Bennett). When the appellant was an Acadia Park employee, he used prescription oxycodone, for which he had documentation from his treating physician that deemed him "able to perform safety-sensitive duties while on his current medication as prescribed."  IAF, Tab 7 at 132; Tab 56 (Bennett).

March 2023 – the appellant requests reassignment.

In March 2023, the appellant informed Aldrich that he was "unable to drive at all" pending his upcoming appointments with a neurologist and

---

[7] The OIG complaints included the appellant's disclosures that Heath used marijuana on the job and while retaining a Class A CDL and abused a government credit card.  IAF, Tab 44 at 40, 43.

10

ophthalmologist and he requested "reassignment to another position" that would not require a CDL or could be performed with a waiver for the CDL.  He also provided the 2020 and 2021 documentation from his treating physician that he could perform safety sensitive duties while taking oxycodone as prescribed.  IAF, Tab 7 at 147-48; Tab 8 at 9-10; Tab 56 (Bennett).

The appellant also sent Aldrich information related to a SAP in which he had participated.  The discharge summary reflects that the appellant was admitted to Recovery Resources on October 15, 2022, and discharged 30 days later.  IAF, Tab 8 at 5-6. The appellant testified that he left the SAP when he did because, together with his work hours, his days were very long and he was in significant pain from sitting for too long.  IAF, Tab 56 (Bennett).  The appellant testified that he worked out an arrangement with Recovery Resources to see his counselor on his days off.  He believed that this alternate arrangement was permissible because Recovery Resources was aware of the plan.  *Id*.  There is no evidence that when the appellant made this alternate arrangement for drug counseling, he informed Aldrich or anyone else at SEKI of his plan.

Supervisory Drug Program Specialist Bryan Castelow contacted the Recovery Resources facility to verify the appellant's participation in a SAP.  He was told that: (1) the IOP is 8 weeks long with 24 mandatory sessions; (2) the appellant left the program before he completed the IOP; and (3) there was no record of any SAP assessment for the appellant.  IAF, Tab 54-1 (Castelow); *see also* Tab 8 at 4.

It is undisputed that the appellant did not complete the same 8-week intensive outpatient program in which he had enrolled.

The proposal and decision to remove the appellant.

On February 27, 2024, the agency proposed the appellant's removal based on four charges: (1) Refusal to Drug Test, (2) Failure to Meet a Requirement of

11

Your Testing Designated Position, (3) Lack of Candor, and (4) Violation of Personnel Bulletin 17-15. IAF, Tab 7 at 220-233 (proposal letter).

The appellant responded orally and in writing to Deciding Official Jennifer Madello on March 15, 2024. IAF, Tab 6 at 4-76, 77. The appellant filed a complaint with the Office of Special Counsel (OSC) on March 21, 2024, which was closed on April 30, 2024. IAF, Tab 1 at 35-41 (complaint), at 42 (OSC close-out letter).[8]

On July 17, 2024, Madello notified the appellant that she had reviewed additional information that was not part of the original evidence file and provided him with an opportunity to respond to the additional information. IAF, Tab 5 at 54-55. The appellant responded to the additional information on July 24, 2024. IAF, Tab 5 at 52-53.

On October 15, 2024, Madello issued a written decision sustaining the charges and the penalty. IAF, Tab 5 at 36-49. The agency removed the appellant effective October 18, 2024. IAF, Tab 5 at 35. This timely appeal followed. During the adjudication of this appeal, the agency withdrew charge 2 and charge 3. IAF, Tab 46, ¶ 5.


Burdens of Proof and Applicable Law

1. Whether the agency proved by a preponderance of the evidence the factual basis of the charged misconduct?

2. Whether the agency proved by a preponderance of the evidence a nexus between its charges and the efficiency of the service?

3. Whether the agency proved by a preponderance of the evidence the reasonableness of the selected penalty?

IAF, Tab 36; *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997); 5 C.F.R. § 1201.56(b)(1)(ii).

---

[8] The appellant had until July 5, 2024, to file an Individual Right of Action appeal and there is no evidence he did.

12

A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.56(b)(1)(ii), 5 C.F.R. § 1201.4(q).

The appellant asserted two affirmative defenses: (1) retaliation for whistleblowing; and (2) disability discrimination based on a theory that the agency failed to accommodate his medical conditions. IAF, Tab 16; Tab 46, ¶ 6.

Accordingly, I also must adjudicate the following issues with respect to the affirmative defenses:

4. Whether the appellant proved by preponderant evidence that he made a disclosure that is protected by the whistleblower statutes and that the disclosure was a contributing factor in the agency's decision to remove him from his job?

5. If so, whether the agency proved by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure or protected activity?

6. Whether the appellant proved by a preponderance of the evidence that he is a qualified individual with a disability and that his removal was based on the agency's failure to provide a reasonable accommodation for his disability?

IAF, Tab 36; 5 C.F.R. § 1201.56(b)(2)(i)(C).

Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established. 5 C.F.R. § 1209.4(e). It is a higher standard than preponderant of the evidence.

In this decision, issues of credibility and the weight to be given written statements and other documentary evidence, other than any stipulated facts, have

13

been resolved by applying the credibility factors articulated in *Hillen*[9] *v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987), as well as the factors governing hearsay weight, as articulated in *Borninkhof*[10] *v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981). *See* IAF, Tab 46, ¶¶ 14, 15. There was no dispute about the reliability of the underlying material documents, and I find they were indeed reliable.

The agency proved Charge 1, Refusal to Drug Test.

In Charge 1, Refusal to Drug Test, the agency charged the appellant as follows:

> On September 27, 2022, you were directed to submit to a random drug test in accordance with the Agency's drug testing program. You refused to complete the test. As a result, the formal result of your drug test was documented as a "Refusal to Test."

IAF, Tab 5 at 41.

As set forth above, the following facts are undisputed. The facts were observed and reported to management by the person administering the drug test (also referred to above as the collector) and admitted to by the appellant at the time of the test and in a subsequent in-person meeting with management.

---

[9] The *Hillen* factors are: (1) the witness' opportunity and capacity to observe the event or act in question; (2) the witness' character; (3) any prior inconsistent statement by the witness; (4) a witness' bias, or lack of bias; (5) the contradiction of the witness' version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness' version of events; and (7) the witness' demeanor. 35 M.S.P.R. at 458.

[10] The *Borninkhof* factors are: (1) the availability of persons with firsthand knowledge to testify at the hearing; (2) whether the statements of the out-of-court declarants were signed or in affidavit form, and whether anyone witnessed the signing; (3) the agency's explanation for failing to obtain signed or sworn statements; (4) whether declarants were disinterested witnesses to the events, and whether the statements were routinely made; (5) consistency of declarants' accounts with other information in the case, internal consistency, and their consistency with each other; (6) whether corroboration for statements can otherwise be found in the agency record; (7) the absence of contradictory evidence; and (8) credibility of declarant when he made the statement attributed to him. 5 M.S.P.R. 77, 87 (1981).

14

The appellant reported for a random drug test on September 27, 2022, as directed. The first urine sample he provided could not be tested because it was outside the allowable temperature range. This temperature problem triggered the need to immediately collect a second sample, as provided by the agency's drug test policy (Personnel Bulletin 17-15). *See also*, IAF, Tab 53 (voicemail from the collector about the need for a second collection). However, because the appellant admitted to the collector that he was trying to cheat the random drug test by using synthetic urine, and showed the collector the bag of synthetic urine strapped to his leg, a second sample was not collected. *See also*, IAF, Tab 52 (voicemail from the collector about "refusal to test"). The appellant offered to stay until he could provide a second urine sample, but the collector sent him back to work and documented the drug test as a "refusal to test."

The appellant argues that he did not "refuse to test" because he offered to remain at the drug testing facility until he could provide another sample. I give no weight to this argument as it is contradicted by the agency's policy and guidance for drug testing, which the appellant was subject to and of which he had prior notice. The policy provides that an attempt to alter or substitute a specimen for a drug or alcohol test is considered a "refusal to take a drug or alcohol test when required." IAF, Tab 8 at 51 (section 18.E); Tab 54-1 (Castelow). It is undisputed that the appellant attempted to substitute his urine with urine from a bag strapped to his leg. Therefore, the agency properly considered the outcome of the appellant's September 27, 2022 random drug test as a "refusal to test."

It also is undisputed that the appellant was properly selected for a random drug test because he held a position that was subject to drug testing. IAF, Tab 8 at 44. The appellant knew he could be randomly drug tested and that marijuana was one of the drugs that would be tested. IAF, Tab 56 (Bennett cross-examination).

15

Based on the complete record in this appeal, I find that the agency proved by preponderant evidence that the appellant engaged in the misconduct in Charge 1 and I sustain the charge.

The agency proved Charge 4, Violation of Personnel Bulletin 17-15.

In Charge 4, Violation of Personnel Bulletin 17-15, the agency charged the appellant as follows:

> Specification 1: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around September 27, 2022, you admitted to Leroy Campbell, the drug testing collector at the drug testing facility, that you were attempting to cheat the drug test you were directed to take due to potential traces of THC.
>
> Specification 2: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around October of 2022, you verbally admitted to your supervisor, Nathanial Aldrich that you attempted to foil the drug test coordinator because you had used marijuana.
>
> Specification 3: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. In a signed statement you provided to your supervisor, Nathanial Aldrich, dated November 22, 2022, you admitted to using marijuana after you accepted your position at SEKI and admitted to using marijuana after work with Nicholas Heath.

IAF, Tab 5 at 43.

As set forth above, the appellant admitted to the conduct in specifications 1-3, each of which is a violation of PB 17-15.

16

First, it is undisputed that on September 27, 2022, during the random drug test, the appellant admitted to the collector that he was trying to cheat the test. The collector further documented:

> [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19.

I find the collector's statement reliable because it is a signed and certified statement, routinely provided in a Collection Questionnaire by a disinterested witness to a drug test, and corroborated by the voicemail messages the collector left for Aldrich on the same day as the random drug test. The collector's statement is further corroborated by appellant's subsequent admission to Aldrich that he had smoked marijuana since working at SEKI and had been trying to cheat the random drug test. *See Borninkhof*, 5 M.S.P.R. at 87.

Second, it is undisputed that the appellant admitted to Aldrich during an October 2022 meeting that he tried to cheat the random drug test because he had used marijuana. The appellant testified that he told Aldrich why he tried to cheat the random drug test and Aldrich testified to the same.

Third, the undisputed record evidence establishes that the appellant admitted, in writing, that he had used marijuana since starting work at SEKI and had even smoked marijuana, after work, with supervisor Heath. IAF, Tab 8 at 14; Tab 56 (Bennett, re-cross examination).

Based on the above undisputed record evidence, I find the agency proved specifications 1-3 by preponderant evidence, I sustain specifications 1-3, and I sustain Charge 4.

<u>The agency proved nexus</u>.

An adverse action may only be taken for such cause as will promote the efficiency of the service. An adverse action promotes the efficiency of the service, satisfying the nexus requirement, where the grounds for the action relate

17

to either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *See Fontes v. Department of Transportation*, 51 M.S.P.R. 655, 665 n.7 (1991). I find that there is a nexus between the appellant's ability to perform in a designated drug testing position and the efficiency of the service.

It is undisputed that the appellant's occupied a testing designated position and was subject to DOT rules because his position required a valid CDL. The result of a properly administered random drug test in September 2022 was "refusal to test," which itself resulted in the appellant being restricted from duties that required a CDL and/or safety sensitive duties until he completed a substance abuse program. The deciding official concluded that the appellant's admission to using a Schedule 1 controlled substance had a direct and negative relationship to remaining in a testing designated position. The deciding official testified that the appellant's deception at the random drug test eroded her confidence that he could follow the agency's policies and perform his testing designated position duties as expected. IAF, Tab 5 at 45; Tab 55 (Madello). Based on this evidence, I find the agency proved the nexus requirement.

The agency proved the removal penalty was reasonable.

Where, as here, I have sustained all the charged misconduct, I may mitigate the penalty only if it exceeds the tolerable limits of reasonableness or if the agency failed to weigh the relevant factors. *Raco v. Social Security Administration*, 117 M.S.P.R. 1, ¶ 13 (2011).

The factors I must consider, where appropriate, in reviewing the penalty for reasonableness are set forth in *Douglas v. Department of Veterans Administration,* 5 M.S.P.R. 280, 305-06 (1981). While not purporting to be exhaustive, the Board identified the following factors in *Douglas*: (1) the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or

inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Id*. If the agency considered all of the relevant *Douglas* factors, I must give due deference to its decision. *Raco*, 117 M.S.P.R. 1, ¶ 13.

Jennifer Madello testified that she was the deciding official for the appellant's removal action. In her notice of decision and at hearing, Madello related some of the *Douglas* factors she considered prior to making her decision. *See* IAF, Tab 5 at 43-47; Tab 55 (Madello).

The deciding official reported that she considered the nature and seriousness of the charges, the fact that the appellant had no prior discipline, that he had a good work record and acceptable performance, the consistency of the penalty with other such offenses, the fact that the appellant knew the rules he was violating, and alternative sanctions. Madello testified that she had no confidence

that the appellant could uphold agency policies in the future, or that a lesser sanction would be adequate, noting that the policies provided the appellant with an opportunity to complete a substance abuse program and return to his duties, but the appellant failed to follow through. She reported that the appellant's deception during the random drug test also showed that he knew he had engaged in conduct that violated the workplace drug program and this eroded her confidence that he could follow the rules. IAF, Tab 55 (Madello).

Madello gave considerable thought to whether the appellant had presented sufficiently mitigating circumstances for his undisputed misconduct. She testified that the appellant's claims that his supervisor used drugs and coached him how to cheat a random drug test, if true, were mitigating circumstances. Madello ultimately decided that the severity of the charged misconduct, together with the appellant's clear notice of the law and agency policies relevant to his TDP position, outweighed any mitigating circumstances. The deciding official ultimately concluded that the appellant made a series of bad choices, from using marijuana while employed by the agency to trying to foil the random drug test. This balance led her to conclude that removal – rather than a suspension or a permanent reassignment to other duties – was the only appropriate penalty. IAF, Tab 55 (Madello, direct examination and cross-examination).

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service. I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal. For these reasons, I find the agency proved that the penalty it sustained was reasonable.

20

The appellant proved no affirmative defense that requires reversal of the Board's action.

Under 5 U.S.C. § 7701(c)(2), the Board is required to reverse the action of the agency, even where the agency has met its burden of proof, if the appellant shows that the decision was based on any prohibited personnel practice described in 5 U.S.C. § 2302(b), or shows that the decision was not in accordance with law. 5 C.F.R. § 1201.56(c). With respect to a claim of whistleblower retaliation, the Board will reverse the agency's action unless the agency shows by clear and convincing evidence that it would have taken the same action even absent the disclosure or activity. *Campbell v. Department of the Army*, 123 M.S.P.R. 674, ¶ 12 (2016).

The appellant demonstrated through the "knowledge/timing" test that his whistleblowing activity was a contributing factor in the agency's decision to remove him from his TDP position.

The appellant argued that he was removed based on retaliation for making protected disclosures about his supervisor's illegal conduct in the workplace. IAF, Tabs 36, 45, 46. An appellant may assert whistleblower retaliation as an affirmative defense to an agency action. *Campbell*, 123 M.S.P.R. 674, ¶ 11; *Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶ 19 (2013); 5 C.F.R. § 1201.56(b)(2)(i)(C)). In such instances, "[o]nce the agency proves its adverse action case by [the applicable standard], the appellant must show by preponderant evidence that he made a disclosure under 5 U.S.C. § 2302(b)(8) and that the disclosure was a contributing factor in the agency's personnel action." *Shibuya*, 119 M.S.P.R. 573, ¶ 19.

21

Protected whistleblowing occurs when an employee makes a disclosure[11] they reasonably believe evidences any violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial or specific danger to public health and safety. 5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008); *see also Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 10 n.3 (2015) (defining "gross mismanagement" as something more than "management decisions which are merely debatable"; "abuse of authority" as an allegation that a "federal official has arbitrarily or capriciously exercised power which has adversely affected the rights of any person or has resulted in personal gain or advantage to himself or to preferred other persons"; and "gross waste of funds" as "more than [a] debatable expenditure [that] is significantly out of proportion to the benefit reasonably expected to accrue to the government").

Protected whistleblowing also occurs, in relevant part, when an employee exercises an appeal, complaint, or grievance right that is made with regard to remedying a violation of law, rule, or regulation or other type of § 2302(b)(8) disclosure; or discloses information to the Inspector General or Special Counsel, in accordance with applicable provisions of law. 5 U.S.C. § 2302(b)(9)(A)(i), (C).

As discussed above, in November 2022 the appellant reported to upper management that his supervisor smoked marijuana at work, encouraged the appellant to smoke marijuana for pain management, and advised the appellant how to cheat a random drug test. IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett). I find the appellant proved he had a reasonable belief that his supervisor's conduct violated law, rule, and policy prohibiting the use of illegal

---

[11] A whistleblowing "disclosure" is defined at 5 U.S.C. § 2302(a)(2)(D) as a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences (i) any violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(a)(2)(D).

drugs at work. The appellant also reported his observations that Heath was an abusive manager to some of his staff. IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett). Here too, I find that the appellant had a reasonable belief that the conduct he reported evidenced a violation of law, rule, or regulation addressing the standards of conduct for Federal employees and the agency's anti-harassment policy. In February 2023, the appellant made these same disclosures to the agency's OIG; and in March 2024, to the OSC. IAF, Tab 1 at 35-41; Tab 44 at 39-42. Thus, I find the appellant proved by preponderant evidence that he engaged in whistleblowing activity under 5 U.S.C. § 2302(b)(9)(A)(i), (C).

Once an employee has proven that they made protected disclosures or engaged in protected activity, they must next show by a preponderance of the evidence that the protected disclosures or activity was a "contributing factor" in the personnel action on appeal. "The most common way of proving the contributing factor element is the 'knowledge/timing test.'" *Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 21 (2016) (citations omitted). Under the knowledge/timing test, "an appellant can prove that [the] disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." *Id*.

An appellant can also show contributing factor by showing that the official who took the action had constructive knowledge of the protected disclosure or activity. *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 11 (2012). The appellant may do so by "demonstrating that an individual with actual knowledge of the disclosure [or protected activity] influenced the official accused of taking the retaliatory action." *Id*. The Board has also held that if an appellant fails to satisfy the knowledge/timing test, the administrative judge must consider "other evidence, such as evidence pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was

23

personally directed at the proposing or deciding officials, and whether [those] individuals had a desire or motive to retaliate against the appellant." *Id.*, ¶ 15; *see also Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 65.

Based on the complete appeal record, I find no evidence that the proposing official had any awareness of the appellant's disclosures about his supervisor's on-the-job drug use or his OIG complaint. The proposal letter itself makes no express reference to the appellant's whistleblowing activity. *See* IAF, Tab 7 at 220-29. Reynolds did not testify at the hearing, but employee relations specialist Harris testified that Reynolds was selected to be the proposing official because he was outside the appellant's supervisory chain of command and thus a more suitable, impartial proposing official. IAF, Tab 54-6 (Harris). Harris helped Reynolds draft the notice of proposed removal and no one in the appellant's supervisory chain was involved. *Id.*

However, the deciding official testified that she was aware of the appellant's complaints about his immediate supervisor's drug use and harassment of other employees because he told her about it in his written response and discussed it during the oral response. IAF, Tab 6 at 77; Tab 55-3 (Madello, direct examination); Tab 55-4 (Madello, cross examination). This sufficiently demonstrates that the deciding official knew about the appellant's disclosures before she issued the decision removing him, which establishes the contributing factor element based on the "knowledge/timing" test. This means the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action even if it had not known about the whistleblowing.

The agency proved by clear and convincing evidence it would have removed the appellant even if he had not made protected disclosures about workplace drug use and harassment.

Because the appellant has met his initial burden, the Board will reverse that action unless the agency shows by clear and convincing evidence that it would

24

have taken the same action even absent the disclosure or activity. "In determining whether the agency has met this burden, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated." *Campbell*, 123 M.S.P.R. 674, ¶ 12 (citing *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999)); *see also Whitmore v. Department of Labor*, 680 F.3d 1353, 1365 (Fed. Cir. 2012) (discussing *Carr* factors).

On *Carr* factor 1, the strength of the agency's evidence in support of its action, the Board and Federal Circuit have held that the strength of the agency's evidence is assessed based on the evidence available to it at the time it took the action. *Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 46 (discussing *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1372-73 (Fed. Cir. 2001)). As discussed above, the appellant does not dispute that he engaged in the conduct in Charge 1. His random drug test was reported as a "refusal to test" because he admitted he tried to substitute a bag of urine he purchased for his own urine.

The appellant also admitted he engaged in the conduct in Charge 4. Under the agency's workplace drug policy, PB 17-15, the use of illegal drugs, including marijuana, is not permissible. He admitted he tried to cheat the random drug test because of his marijuana use. The appellant's misconduct was directly related to his duties because he was in a TDP and operated heavy equipment, and knew that his TDP position and the workplace drug policy subjected him to special rules which he disregarded.

On *Carr* factor 2, the existence and strength of any motive to retaliate, there is no evidence that the deciding official was personally motivated to retaliate against the appellant. Madello was an experienced deciding official with

no personal knowledge of, or contact with, the appellant until she received his case file. Madello testified candidly that the appellant told her about his whistleblowing activity in his responses but that she did not consider the information in her decision. Instead, she relied on the fact that the appellant knew he was responsible for complying with the agency's policies prohibiting illegal drug use and requiring him to take random drug tests because he was in a TDP position, but made choices antithetical to his responsibilities. I considered the entirety of Madello's testimony very credible. She gave thorough and clear responses to questions from both parties, demonstrated a nuanced understanding of the process of deciding discipline, and was attentive both to the subject matter of the questions as well as potential privacy or confidentiality implications. Her overall hearing demeanor demonstrated integrity and impartiality. *See Hillen*, 35 M.S.P.R. at 458.

Finally, *Carr* factor 3 looks at evidence of similar actions against employees who are not whistleblowers. Here, Madello credibly testified that she was unaware of any employees who refused to test and were not removed.

I have considered the entirety of the record and weighed the credible evidence on each *Carr* factor together to determine whether the evidence is clear and convincing as a whole. *Rickel v. Department of the Navy*, 31 F.4th 1358, 1366 (Fed. Cir. 2022). With the evidence on *Carr* factors 1 and 2 weighing strongly in the agency's favor, I am satisfied that the agency would have removed the appellant had he not made protected disclosures about his supervisor's unlawful conduct. Thus, I conclude that the agency met its clear and convincing burden and the removal action was not retaliation for whistleblowing.

The appellant failed to prove his disability discrimination claim.

The appellant alleged the agency's decision to remove him was disability discrimination based on the failure to provide him with a reasonable accommodation. Specifically, he contends that the agency failed to accommodate

26

his deteriorating vision condition when it did not reassign him to a position at SEKI where he was not required to have or maintain a CDL. IAF, Tab 22 at 9, 17; Tab 23 at 112; Tab 56 (Bennett).

As a Federal employee, the appellant's disability discrimination claim arises under the Rehabilitation Act of 1973. However, the Equal Employment Opportunity Commission (EEOC) regulations implementing the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA), have been incorporated by reference into the Rehabilitation Act, and the Board applies them to determine whether there has been a Rehabilitation Act violation. *Desjardin v. U.S. Postal Service*, 2023 MSPB 6, ¶ 27 (citing *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 35). Only an otherwise qualified individual with a disability is entitled to relief, whether the individual alleges disability discrimination based on a disparate treatment or reasonable accommodation theory. *Id*. (citing *Haas v. Department of Homeland Security*, 2022 MSPB 36, ¶¶ 28-29).

The appellant may prove he has a disability by showing that he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1), (2), (3). The definition of disability is construed in favor of broad coverage. 42 U.S.C. § 12102(4)(A). A physical or mental impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h). The test for whether a disability substantially limits the ability of an individual to perform a major life activity is applied as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include but are not limited to activities such as caring for oneself, hearing, performing manual tasks, lifting, bending, and working, including the operation of a major bodily function. 29 C.F.R. § 1630.2(i).

27

At the time of his removal, the appellant had been diagnosed with aggressive inflammatory arthritis, an autoimmune disease, and glaucoma and pigment dispersion syndrome. IAF, Tab 7 at 93. Based on the medical evidence he provided, I find the appellant established by preponderant evidence that, at the time of his removal, he had a physical impairment(s) that substantially limited one or more major life activities and was an individual with a disability.

The Rehabilitation Act requires an agency to provide reasonable accommodation to a *qualified* individual with an actual disability or a record of a disability. 29 C.F.R. § 1630.2(o)(4) (emphasis added). To be a qualified employee with a disability who is entitled to a reasonable accommodation for his condition, the appellant must establish that, with or without reasonable accommodation, he can safely perform the essential functions of his position or a vacant position to which he could be reassigned. *Desjardin*, 2023 MSPB 6, ¶ 28.

Having found the appellant is a person with a disability as defined by 29 C.F.R. § 1630.2(g)(1)(i) based on his medical conditions, I now evaluate whether the appellant proved by preponderant evidence that he is a qualified individual with a disability.

In November 2022, the appellant informed Aldrich that his eyesight was deteriorating and he was concerned about his ability to safely perform work that required a CDL. IAF, Tab 54 (Aldrich); Tab 56 (Bennett). Before the conversation with Aldrich, the appellant tried to have conversations with Heath about his chronic physical pain, but Heath avoided the subject because he did not think that an employee's medical information was his business. IAF, Tab 54-2 (Heath); Tab 56 (Bennett).

However, the record is clear that the appellant admitted he was concerned he was going to lose his CDL due to a physical disability as early as October 2022. In a sworn affidavit dated August 31, 2023, the appellant stated that he could not operate heavy machinery, sit for long periods of time, climb, or lift and

28

move heavy objects. IAF, Tab 7 at 94. In a letter to Aldrich dated March 23, 2023, the appellant explained:

> My physical impairment is currently related to my vision, specifically my depth perception, preventing me from driving or operating heavy machinery at this time. This directly affects my ability to perform any part of my job duties related to use of my Class A CDL, operation of any heavy machinery or operation of any motor vehicle.

IAF, Tab 7 at 147-148 (March 23, 2023, medical information provided to Aldrich).

I acknowledge that the appellant's statements in March 2023 described his inability to perform his job duties "at this time." However, the appellant provided no documentary or testimonial evidence that his vision impairment improved such that he could resume the full performance of his duties before the agency removed him.

Further, at no time during his employment did the appellant provide medical documentation to the agency that identified any accommodation that would have allowed the appellant to perform the essential functions of his position. Nor did the appellant testify that he identified any such accommodations. He candidly admitted that only a different job would allow him to continue working at SEKI with his disabilities.

Aldrich testified that during the November 2022 meeting with the appellant, the topic came up about other jobs at SEKI that did not require a CDL. The appellant confirmed it was a casual conversation and that he only formally requested reassignment to a different position in March 2023. IAF, Tab 56 (Bennett); *see also* Tab 7 at 147-148.

It is undisputed that the appellant's position required a Class A CDL to operate heavy machinery. Preponderant evidence shows that the appellant was no longer able perform those job duties due to his disabilities. For these reasons, I

find that the appellant did not prove he was a qualified individual with a disability to whom the agency had to provide a reasonable accommodation.

In addition, as regards the appellant's request for reassignment, I find that the agency was not required to perform a job search before the appellant demonstrated to the agency that he was fit for continued employment. Aldrich testified that he told the appellant, in November 2022, that any job search was contingent on the appellant completing a SAP. The appellant was aware of this requirement as he admitted that Aldrich told him in October 2022 that he would likely be suspended for his conduct once he completed the SAP, but would face removal if he did not complete a SAP. IAF, Tab 56 (Bennett). I find it entirely reasonable for an employer to wait to conduct a search for a reassignment where an employee must first demonstrate his fitness for continued employment by, for example, following through on a mandatory SAP. *See, e.g., Gena C. v. Department of the Navy*, EEOC Appeal No. 2024002902, 2024 WL 2704605 (May 13, 2024) (An employer is not obligated to consider or grant an employee's request for accommodation that is raised for the first time after the employee has engaged in unacceptable conduct); *see also Elias R. v. Department of Veterans Affairs*, EEOC Appeal No. 2019001826, 2019 WL 7170891 (Nov. 20, 2019) (the EEOC has stated that "reasonable accommodation is always prospective" and thus an agency is not required to excuse past misconduct even if the misconduct was based on the employee's disability.).

Based on this record, I conclude that the appellant was not a qualified individual with a disability when the agency removed him. Further, the agency did not discriminate against the appellant by not reassigning him to a different position as a reasonable accommodation. The appellant's disability discrimination claim, based on failure to accommodate, thus fails.

30

Conclusion

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service.  I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal.  Further, I find that the agency did not discriminate against the appellant based on a disability or retaliate against him for reporting supervisor misconduct.  Accordingly, the agency's removal action is affirmed.

## DECISION

The agency's action is AFFIRMED.

*Cynthia B. De Nardi*

FOR THE BOARD:      _____
                    Cynthia B. De Nardi
                    Administrative Judge

## NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date.  See 5 C.F.R. § 1201.112(a)(4).

## NOTICE TO APPELLANT

This initial decision will become final on **October 23, 2025**, unless a petition for review is filed by that date.  This is an important date because it is usually the last day on which you can file a petition for review with the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives

the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.  The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record.  You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website  (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

32

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents,

Case: 26-1289    Document: 1-2    Page: 34    Filed: 12/29/2025    (40 of 153)
Case 1:26-cv-05029-JLT-FJS    Document 1    Filed 06/30/26    Page 40 of 153

33

table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision.  The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

## NOTICE OF LACK OF QUORUM

While administrative judges may continue to issue initial decisions like this one, the Board must have two or more members (known as a quorum) to issue

decisions on petitions for review (PFR).    See 5 U.S.C. § 1201; 5 C.F.R. § 1200.3(a), (e). Currently, the Board only has one member, so it is unable to issue any final Board decisions on PFRs. This means that while parties may still file PFRs on initial decisions during this time, no decisions on them will be issued until at least two members are in place, thereby restoring the Board's quorum. Importantly, the absence of a quorum does not extend any deadlines for filing a PFR. Anyone filing a PFR must still meet the deadline outlined above.

## NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review.  Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the

35

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.** As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

36

**(2)  Judicial or EEOC review of cases involving a claim of discrimination**.  This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination.  If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security.  *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>.  5 U.S.C. § 7702(b)(1).  You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above.  5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

37

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3)** **Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

38

for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail             Scott Bennett
550 Dexter Ave
Porterville, California 93257

<u>Appellant Representative</u>

Electronic Service     Dawn Bennett
Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service     Gregory Thornton
Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service     Julia Zukina
Served on email address registered with MSPB

*Jacob L Jones*

| 09/18/2025 | Jacob L Jones |
|---|---|
| (Date) | Paralegal Specialist |



# U.S. MERIT SYSTEMS PROTECTION BOARD

## Office of the Clerk of the Board
**1615 M Street, N.W.**
**Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

2026-1289

## ATTESTATION

I HEREBY ATTEST that the attached index represents a list of the documents comprising the administrative record of the Merit Systems Protection Board in the appeal of *Scott Bennett v. Department of the Interior*, MSPB Docket No. SF-0752-25-0045-I-1, and that the administrative record is under my official custody and control on this date

on file in this Board

| | |
|---|---|
| January 9, 2026 | /s/ |
| Date | Gina K. Grippando |
| | Clerk of the Board |

CERTIFICATE OF SERVICE

I hereby certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

Petitioner

| Electronic Mail (via mspb@mspb.gov) | Scott Bennett Scottb0213@aol.com |
|---|---|

Respondent

| Electronic Mail (via mspb@mspb.gov) | Patricia M. McCarthy, Director Commercial Litigation Branch Civil Division Classification Unit U.S. Department of Justice c/o Joan Turman joan.turman@usdoj.gov |
|---|---|

| January 9, 2026 | /s/ |
|---|---|
| (Date) | Dinh Chung Case Management Specialist |

Scott Bennett

V.

Department of the Interior

MSPB Docket No. SF-0752-25-0045-I-1

## I - Initial Appeal

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | ISSUED/RECEIVED DATE |
|---|---|---|---|
| 1 | IA | Appellant - Initial Appeal | 10/21/2024 |
| 2 | IA | MSPB - Acknowledgment Order | 10/23/2024 |
| 3 | IA | Agency - Agency Request to Remove Jessica Pollack As Agency Representative | 10/28/2024 |
| 4 | IA | Agency - Agency Rep Addition | 10/28/2024 |
| 5 | IA | Agency - Agency Response File Part 1 | 11/08/2024 |
| 6 | IA | Agency - Agency Response File Part 2 | 11/08/2024 |
| 7 | IA | Agency - Agency Response File Part 3 | 11/08/2024 |
| 8 | IA | Agency - Agency Response File Part 4 | 11/08/2024 |
| 9 | IA | MSPB - Order and Notice of Hearing Status Conference and Prehearing Conference | 11/20/2024 |
| 10 | IA | Appellant - Request for Extension of Time | 11/20/2024 |
| 11 | IA | MSPB - Order Rescheduling Status Conference | 11/21/2024 |
| 12 | IA | Appellant - Appellant Response File | 12/09/2024 |
| 13 | IA | Appellant - Motion Requesting Order to Suspend Processing of Appeal | 12/09/2024 |
| 14 | IA | Agency - Agency Motion to Compel Discovery | 12/11/2024 |
| 15 | IA | Agency - MSPB Mediation Agreement Form Signed by All Parties | 12/11/2024 |
| 16 | IA | MSPB - Order and Summary of Status Conference | 12/11/2024 |
| 17 | IA | MSPB - Mediation Notices | 12/11/2024 |
| 18 | IA | Appellant - Request for Extension of Time | 12/19/2024 |
| 19 | IA | Appellant - Narrative Response | 12/30/2024 |
| 20 | IA | Appellant - Appellant Submissions | 12/30/2024 |
| 21 | IA | Appellant - Appellant Response | 01/02/2025 |
| 22 | IA | Appellant - Appellant Submissions | 01/02/2025 |
| 23 | IA | Appellant - Appellant Submissions | 01/02/2025 |
| 24 | IA | Appellant - Appellant Submissions | 01/02/2025 |
| 25 | IA | Appellant - Appellant Submissions | 01/02/2025 |
| 26 | IA | Appellant - Appellant Submissions | 01/02/2025 |

Scott Bennett

V.

Department of the Interior

MSPB Docket No. SF-0752-25-0045-I-1

## I - Initial Appeal

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | ISSUED/RECEIVED DATE |
|---|---|---|---|
| 27 | IA | MSPB - Order Rejecting Fax Submissions | 01/08/2025 |
| 28 | IA | MSPB - Mediation Termination Notice | 02/07/2025 |
| 29 | IA | MSPB - Status Conference Order | 03/04/2025 |
| 30 | IA | Agency - Request for Extension of Time | 03/04/2025 |
| 31 | IA | MSPB - Request for Extension Denied Without Prejudice | 03/05/2025 |
| 32 | IA | Agency - Unopposed Motion to Continue Status Conference to March 13 or March 14 | 03/05/2025 |
| 33 | IA | MSPB - Order Rescheduling Status Conference | 03/07/2025 |
| 34 | IA | Appellant - Motion Requesting Reopening of Formal Discovery | 03/11/2025 |
| 35 | IA | Agency - Agency Rep Addition | 03/14/2025 |
| 36 | IA | MSPB - Hearing Order and Summary of Status Conference | 03/14/2025 |
| 37 | IA | Agency - Agency Response Regarding ARF Tabs 7-8 | 03/19/2025 |
| 38 | IA | MSPB - ORDER REGARDING AGENCY FILE | 03/20/2025 |
| 39 | IA | Agency - Agency Response to Appellant Motion to Reopen Discovery | 03/21/2025 |
| 40 | IA | Appellant - Appellant Request to Withdraw Motion to Reopen Formal Discovery | 03/24/2025 |
| 41 | IA | MSPB - ORDER GRANTING REQUEST TO WITHDRAW DISCOVERY MOTION | 03/25/2025 |
| 42 | IA | MSPB - Case Reassignment Order | 04/03/2025 |
| 43 | IA | MSPB - Order Rescheduling | 04/04/2025 |
| 44 | IA | Agency - Agency Prehearing Submission | 04/23/2025 |
| 45 | IA | Appellant - Appellant Pre-Hearing Submission | 04/23/2025 |
| 46 | IA | MSPB - Order and Summary of Prehearing Conference | 05/02/2025 |
| 47 | IA | MSPB - Nathaniel Aldrich Subpoena | 05/02/2025 |
| 48 | IA | Agency - Agency Filing re Order and Summary of Prehearing Conference | 05/02/2025 |
| 49 | IA | MSPB - Notice re Additional Hearing Date and Time | 05/08/2025 |
| 50 | IA | MSPB - Notice of Date and Time for Closing Statements | 05/13/2025 |
| 51 | IA | Agency - Cover Letter for Agency Tabs 4r and 4s | 05/15/2025 |

Scott Bennett

V.

Department of the Interior

MSPB Docket No. SF-0752-25-0045-I-1

I - Initial Appeal

| TAB | RECORD TYPE | DESCRIPTION OF DOCUMENT | ISSUED/RECEIVED DATE |
|-----|-------------|-------------------------|----------------------|
| 52 | IA | Agency - Tab 4r Sept 27, 2022 Second Voicemail Attachment to Proposed Removal | 05/15/2025 |
| 53 | IA | Agency - Tab 4s Sept 27, 2022 First Voicemail Attachment to Proposed Removal | 05/15/2025 |
| 54-3 | IA | MSPB - Nathaniel Aldrich Audio | 05/20/2025 |
| 54-4 | IA | MSPB - Nathaniel Aldrich Audio Cont | 05/20/2025 |
| 54-1 | IA | MSPB - Bryan Castelow Audio | 05/20/2025 |
| 54-2 | IA | MSPB - Nicholas Heath Audio | 05/20/2025 |
| 54-5 | IA | MSPB - Richard Hall Audio | 05/20/2025 |
| 54-6 | IA | MSPB - Elisha Harris Audio | 05/20/2025 |
| 54 | IA | MSPB - May 7, 2025 Hearing Attestation and Speaker Index | 05/20/2025 |
| 55-3 | IA | MSPB - Jennifer Madello Audio | 05/20/2025 |
| 55-6 | IA | MSPB - Closing Remarks Audio | 05/20/2025 |
| 55-2 | IA | MSPB - Marcos Anguiano Audio Cont | 05/20/2025 |
| 55-4 | IA | MSPB - Jennifer Madello Audio Cont | 05/20/2025 |
| 55-5 | IA | MSPB - Joel Heddon Audio | 05/20/2025 |
| 55-1 | IA | MSPB - Marcos Anguiano Audio | 05/20/2025 |
| 55 | IA | MSPB - May 8, 2025 Hearing Attestation and Speaker Index | 05/20/2025 |
| 56-4 | IA | MSPB - Scott Bennett Audio Cont | 05/21/2025 |
| 56 | IA | MSPB - May 13, 2025 Hearing Attestation and Speaker Index | 05/21/2025 |
| 56-2 | IA | MSPB - Scott Bennett Audio | 05/21/2025 |
| 56-1 | IA | MSPB - Clifford Packard Audio | 05/21/2025 |
| 56-3 | IA | MSPB - Scott Bennett Audio Cont | 05/21/2025 |
| 57-1 | IA | MSPB - Closing Arguments Audio | 05/27/2025 |
| 57 | IA | MSPB - May 19, 2025 Hearing Attestation and Speaker Index | 05/27/2025 |
| 58 | IA | MSPB - Suspension Order | 06/11/2025 |
| 59 | IA | MSPB - Initial Decision | 09/18/2025 |

# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD
## WESTERN REGIONAL OFFICE

| | |
|---|---|
| SCOTT BENNETT,<br>　　　　　Appellant, | DOCKET NUMBER<br>SF-0752-25-0045-I-1 |
| 　　v. | |
| DEPARTMENT OF THE INTERIOR,<br>　　　　　Agency. | DATE: September 18, 2025 |

Dawn Bennett, Porterville, California, for the appellant.

Gregory James Thornton, Washington, D.C., for the agency.
Julia Zukina, Washington, D.C., for the agency.

**BEFORE**
Cynthia B. De Nardi
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On October 21, 2024, the appellant timely appealed the agency's removal action. Initial Appeal File (IAF), Tab 1. The Board has jurisdiction. 5 U.S.C. §§ 7511-7513, 7701(a). On April 3, 2025, the appeal was reassigned to me. IAF, Tab 42. I held the appellant's requested hearing by video conference in May 2025, and the record closed on May 27, 2025. IAF, Tabs 54-57.[1]

For the reasons discussed below, the agency's action is AFFIRMED.

---

[1] IAF, Tab 54 is the hearing audio for May 7, 2025. IAF, Tab 55 is the hearing audio for May 8, 2025. IAF, Tab 56 is the hearing audio for May 13, 2025. IAF, Tab 57 is the hearing audio for the parties' closing arguments and my closing of the record.

2

## ANALYSIS AND FINDINGS

Background

At the time of his removal, the appellant worked for the agency as an Engineering Equipment Operator Leader, WL-5716-10, with the National Park Services, Division of Maintenance and Construction, duty stationed at the Sequoia and Kings Canyon National Parks (SEKI) in Three Rivers, California. IAF, Tab 5 at 35. The appellant transferred to SEKI in September 2021 after working for about 10 years at Acadia National Park in Maine. IAF, Tab 8 at 24; Tab 56 (Bennett).

At the times relevant to this appeal, the appellant's supervisors at SEKI were Nicholas Heath, Roads Supervisor, Nathan Aldrich, Facility Manager, and Rick Hall, Chief of Facilities and Construction.

Requirements of the appellant's position

An Engineering Equipment Operator Leader operates heavy equipment for the maintenance of the park's roads and parking lots and provides daily direction to a staff to accomplish this work. IAF, Tab 8 at 26. The position requires the incumbent to have a commercial driver's license (CDL), which the appellant had. IAF, Tab 8 at 25 (Position description provides: "Must maintain a valid Class A Commercial Drivers License with air brakes and hazardous materials endorsement."); Tab 54-5 (Hall); Tab 56 (Bennett).

The appellant's position subjects him "to the requirements of the Department of Transportation (DOT) drug and alcohol testing program" and "is a Testing Designated Position (TDP) under the Department of the Interior Drug-Free Workplace Program." IAF, Tab 8 at 25-26. The appellant's appointment document also notes the Engineering Equipment Operator Leader is a "position subject to drug testing." IAF, Tab 8 at 24 (block 45). The appellant did not dispute that having a CDL is a requirement of his position or that the position is subject to random drug testing.

3

The agency's drug test program: Personnel bulletin 17-15

Personnel bulletin 17-15 (PB 17-15) is the Interior Department's policy and guidance for drug and alcohol testing. IAF, Tab 8 at 39-57 (Drug-Free and Alcohol-Free Workplace Plan). The following provisions of the policy are relevant to the issues in this appeal:

- A TDP, among others, is one covered by the Omnibus Transportation Employee Testing Act of 1991, which means that the incumbent is subject to [DOT] rules, *e.g.* commercial driver's license holders (CDL). IAF, Tab 8 at 41 (Section 3.D.6), 55 (endnote ii); Tab 54-1 (Castlelow).
- TDPs are subject to selection for random drug testing. IAF, Tab 8 at 41, 43-44 (section 6.A).
- An individual selected for random testing will be notified the same day the test is scheduled, preferably within two hours of the scheduled testing. The individual's supervisor should explain to the employee that he/she is under no suspicion of taking drugs and that the employee's name was selected randomly. IAF, Tab 8 at 47 (section 14.C).
- Employees who are referred through administrative channels to undergo counseling or rehabilitation programs for illegal drug use will be subject to unannounced testing, both during and after such a program. IAF, Tab 8 at 44 (section 6.E).
- The agency authorizes a direct observed collection when a donor's previous drug test result was reported by the [Medical Review Officer] as drug positive, adulterated, substituted, invalid without a legitimate medical reason or cancelled because the split specimen failed to reconfirm the primary specimen results or could not be tested. IAF, Tab 8 at 45 (section 9.A).
- At the collection site, an immediate collection of a second urine sample is required in one of the following situations: (1) The temperature of the specimen collected during a routine collection is outside the acceptable temperature range [ . . .]. IAF, Tab 8 at 45 (section 9.B(1)).
- Failure to appear for testing without a deferral will be considered refusal to participate in testing. Employees may be subjected to the full range of disciplinary actions, including removal from Federal service, if they refuse to be tested. If the employee is not removed, he or she will be referred to the [Employee Assistance Program] and required to submit to follow-up testing. IAF, Tab 8 at 46 (section 10).

- Mandatory Administrative Action. The agency shall refer an employee found to use/possess illegal drugs or to use/possess alcohol on duty to the [Employee Assistance Program/Substance Abuse Program]. Employees found to use/possess illegal drugs or to use/possess alcohol on duty (for employees covered by the Omnibus Transportation Employee Testing Act of 1991) will not be allowed to remain on duty in a TDP until successful completion of a rehabilitation program through EAP/SAP. At the discretion of DOI, and as part of an EAP rehabilitation program, an employee may return to duty in a TDP if the employee's return would not endanger public health or safety or national security.  IAF, Tab 8 at 50 (section 18.B).
- Employees referred through administrative channels who undergo a counseling or rehabilitation program for illegal drug use through the EAP or SAP will be subject to unannounced testing for 1 year; a return-to-duty test is required for any employee in a position covered by the Omnibus Transportation Employee Testing Act of 1991.  IAF, Tab 8 at 49-50 (section 17.B).
- A refusal to take a drug or alcohol test when required includes "[a]ttempts to alter or substitute the specimen provided."  IAF, Tab 8 at 51 (section 18.E(3)).

The policy defines "illegal drugs" as both Schedule I and Schedule II controlled substances, which includes marijuana.  IAF, Tab 8 at 40, 41 (sections 3.B, 4.B(3)).   In this decision, marijuana is also referred to as "THC" which denotes the main active compound in the cannabis or marijuana plant.[2]

The random drug test in September 2022.

On September 13, 2022, six SEKI employees, including the appellant, were randomly selected for drug testing.  IAF, Tab 8 at 20.  The appellant's direct supervisor, Nicholas Heath, told him to report to the testing facility on September 27, 2022 for a random drug test.  IAF, Tab 54-2 (Heath); Tab 56 (Bennett).[3]

---

[2]  https://www.mayoclinic.org/drugs-supplements-marijuana/art-20364974 (last viewed September 17, 2025).

[3] Testimony about what else Heath may have told Bennett in advance of the random drug test is disputed.  Bennett testified that Heath gave him specific advice for how to cheat the drug test, which he followed; Heath denied Bennett's account.  Whether Heath advised the appellant on how to cheat the drug test, including where to buy synthetic

5

The appellant reported to the drug testing facility on September 27, 2022. He provided a urine sample that could not be tested because it was not in the allowable temperature range.  As dictated by the agency's Drug-Free Workplace policy, when the temperature of the specimen collected during a routine collection is outside the acceptable temperature range, an immediate collection of a second urine sample is required.  IAF, Tab 8 at 45.

The collector informed the appellant he would have to provide a viable urine specimen under observed conditions and had to remain at the testing facility for up to three hours in order to provide the specimen.  IAF, Tab 8 at 19.  But then the appellant showed the collector that he had a bag of urine strapped to his thigh:

> Upon observation, [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19 (the collector's statement).

The collector left Aldrich two voicemail messages about (1) the need to conduct a second, observed collection from the appellant due to a "non-temp" and (2) why the result of the second, observed collection was a "refusal to test."  The voicemails were forwarded to Hall who provided them to Supervisory Drug Program Specialist Bryan Castelow and Elisha Harris in Human Resources.  IAF, Tab 52-53 (voicemail messages); Tab 54-5 (Hall).

The appellant testified consistently with the collector's documented observation; that is, he admitted that he showed the collector the bag of urine strapped to his leg and admitted that he was trying to cheat the drug test.  The appellant recalled that the collector was "disappointed."  IAF, Tab 56 (Bennett).  Although the appellant offered to stay at the testing facility until he could provide

---

urine to pass off as his own, is not material to my determining whether the agency proved the charged misconduct.  For this reason, I will not decide which witness testified more credibly on this topic, although I found, overall, the appellant a very credible witness.

his own urine for a second drug test, the collector told him he could leave and return to work. *Id*. The appellant returned to work and told Heath what happened.[4] IAF, Tab 56 (Bennett).

It is undisputed that the drug testing policy defines a refusal to test to include a situation where an employee is either unwilling or unable to provide a second specimen, or where an employee attempts to alter or substitute a urine sample. IAF, Tab 54-1 (Castelow); Tab 8 at 51 (section E).

Castelow advised Hall to restrict the appellant from safety sensitive duties and initiate some type of disciplinary proceedings. IAF, Tab 8 at 15-16. According to Hall, Castelow also advised that if management wanted to retain the appellant, he would have to complete a substance abuse program. IAF, Tab 54-5 (Hall).

The appellant's October 2022 meeting with Aldrich.

The appellant's first and second line supervisors, Heath and Aldrich, met with him on October 3, 2022, about the "refusal to test." IAF, Tab 54-3 (Aldrich); Tab 56 (Bennett). The appellant admitted that he tried to cheat the random drug test. The appellant also admitted that he had used marijuana since becoming a SEKI employee, but never while at work. *Id*. The appellant acknowledged that Aldrich and Heath told him he could not operate equipment that required a Class A CDL. IAF, Tab 56 (Bennett). There is a dispute over whether the supervisors explicitly told the appellant that he was restricted from performing "safety sensitive" duties until further notice or provided him a list of the "safety sensitive" duties from which he was restricted. *See* IAF, Tab 56 (Bennett). This distinction, however, is not material to the issues I must adjudicate in this appeal.

---

[4] The appellant testified that Heath asked him if he had the air conditioner on when he drove to the testing facility, and when the appellant said "yes," Heath responded, "that's where you went wrong." IAF, Tab 56 (Bennett).

Finally, Aldrich informed the appellant that if he failed to complete a substance abuse program (SAP) he could face serious discipline, including removal from his position. They discussed a program that Aldrich personally recommended, Recovery Resources, located in Visalia, CA. IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

The appellant's November 2022 meeting with Aldrich and Hall.

The appellant met with his second and third line supervisors, Aldrich and Hall, in November 2022 to discuss what the appellant believed was workplace misconduct by first line supervisor, Heath. IAF, Tab 54-3 (Aldrich); Tab 54-5 (Hall); Tab 56 (Bennett); *see also* Tab 45 at 115. Aldrich took notes at the meeting but also asked the appellant to put his complaint in writing so he could look into it. *See* IAF, Tab 7 at 260. Aldrich testified consistently with his notes that the appellant reported Heath smoked marijuana at work, asked the appellant to smoke marijuana with him at work, and suggested the appellant use synthetic urine to cheat the random drug test and told him where he could buy it.[5] *Id*.; *see also* IAF, Tab 45 at 115-16. The appellant also reported that Heath harassed and micromanaged other members of the crew and may have misused a government credit card. IAF, Tab 7 at 24-25.

During this meeting, the appellant also told Aldrich that his vision was deteriorating and that he had a "near crash" while driving to work.[6] The appellant

_____

[5] Heath denied smoking marijuana with or in front of the appellant or encouraging him to smoke it for medical reasons. IAF, Tab 54-2 (Heath). Whether or not the appellant's disclosure about Heath using illegal drugs is true is not material to any of the issues I must decide in this appeal. For this reason, I will not decide which witness testified more credibly, although as I noted above, I found the appellant to be overall a very credible witness.

[6] The appellant testified that he was on approved leave from July 4-August 21, 2022, while he sought treatment from specialists after he had a "near miss" while driving. IAF, Tab 56 (Bennett). It is unclear whether the "near crash" the appellant told Aldrich about was the same as the "near miss" that preceded his medical leave in the summer of 2022. However, by November 2022, the appellant's vision condition was indisputably interfering with his ability to drive safely.

8

was worried about whether he would be able to keep his Class A CDL.  IAF, Tab 54 (Aldrich); Tab 56 (Bennett).  Aldrich testified that he told the appellant that once the appellant completed the SAP, they could discuss other positions at SEKI for him that did not require a CDL.  IAF, Tab 54 (Aldrich).  The appellant testified that Aldrich suggested the possibilityy of other positions at SEKI for him that did not require a CDL.  IAF, Tab 56 (Bennett).

<u>November 2022 – February 2023 – the appellant and the Substance Abuse Program</u>.

The appellant started attending an intensive outpatient program (IOP) at Recovery Resources on October 18, 2022.  IAF, Tab 8 at 6; Tab 56 (Bennett).

Starting in December 2022, Aldrich asked the appellant several times for a status update on his participation in a SAP.  IAF, Tab 8 at 13; Tab 54 (Aldrich). Aldrich understood from the appellant that he was participating in a SAP one day a week.  IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

By letter dated February 14, 2023, Aldrich asked the appellant to respond and provide documentation, and also informed the appellant:

> Please note, you currently occupy a position which has duties classified as DOT safety-sensitive duties. In order to perform these safety-sensitive duties you must receive an SAP evaluation and successfully comply with the SAP's evaluation recommendations. Therefore, you will not be authorized to return to safety-sensitive duties until the SAP return-to-duty process is successfully completed.

IAF, Tab 8 at 13.

Thus, as of the February 14, 2023, letter to the appellant, Aldrich had no evidence that the appellant had either participated in or completed a SAP.  IAF, Tab 54 (Aldrich). On February 20, 2023, the appellant responded to Aldrich.  He declined to provide SAP documentation until Aldrich provided him with evidence that he was facing disciplinary action and had agreed to participate in a SAP. However, the appellant offered to submit to an observed urine test any time. The

appellant's view was that he never refused to submit to a drug test but that the collector refused to test him.  IAF, Tab 8 at 8-9.

February 2023 – EEO and Inspector General complaints.

On February 15, 2023, the appellant sought equal employment opportunity (EEO) counseling, alleging in part that he had been denied reasonable accommodation since August 2022.  IAF, Tab 5 at 25.  He filed a formal EEO complaint in May 2023 which included the failure to accommodate claim.  *Id*. at 26-27.

On the same date, the appellant submitted two complaints to the Department of Interior's Inspector General (IG) about supervisory misconduct.[7] IAF, Tab 44 at 39-45.  The Department of Interior notified the appellant that it referred his redacted complaints to the National Park Service.  *Id*. at 46.

The appellant's medical conditions.

At all times relevant to this appeal, the appellant had two primary medical conditions: joint pain caused by aggressive inflammatory arthritis and vision problems caused by glaucoma and pigment dispersion syndrome.  IAF, Tab 7 at 93-94; Tab 56 (Bennett).  The appellant moved to California because the climate would be more favorable for his arthritis symptoms.  IAF, Tab 56 (Bennett). When the appellant was an Acadia Park employee, he used prescription oxycodone, for which he had documentation from his treating physician that deemed him "able to perform safety-sensitive duties while on his current medication as prescribed."  IAF, Tab 7 at 132; Tab 56 (Bennett).

March 2023 – the appellant requests reassignment.

In March 2023, the appellant informed Aldrich that he was "unable to drive at all" pending his upcoming appointments with a neurologist and

---

[7] The OIG complaints included the appellant's disclosures that Heath used marijuana on the job and while retaining a Class A CDL and abused a government credit card.  IAF, Tab 44 at 40, 43.

ophthalmologist and he requested "reassignment to another position" that would not require a CDL or could be performed with a waiver for the CDL.  He also provided the 2020 and 2021 documentation from his treating physician that he could perform safety sensitive duties while taking oxycodone as prescribed.  IAF, Tab 7 at 147-48; Tab 8 at 9-10; Tab 56 (Bennett).

The appellant also sent Aldrich information related to a SAP in which he had participated.  The discharge summary reflects that the appellant was admitted to Recovery Resources on October 15, 2022, and discharged 30 days later.  IAF, Tab 8 at 5-6. The appellant testified that he left the SAP when he did because, together with his work hours, his days were very long and he was in significant pain from sitting for too long.  IAF, Tab 56 (Bennett).  The appellant testified that he worked out an arrangement with Recovery Resources to see his counselor on his days off.  He believed that this alternate arrangement was permissible because Recovery Resources was aware of the plan.  *Id*.  There is no evidence that when the appellant made this alternate arrangement for drug counseling, he informed Aldrich or anyone else at SEKI of his plan.

Supervisory Drug Program Specialist Bryan Castelow contacted the Recovery Resources facility to verify the appellant's participation in a SAP.  He was told that: (1) the IOP is 8 weeks long with 24 mandatory sessions; (2) the appellant left the program before he completed the IOP; and (3) there was no record of any SAP assessment for the appellant.  IAF, Tab 54-1 (Castelow); *see also* Tab 8 at 4.

It is undisputed that the appellant did not complete the same 8-week intensive outpatient program in which he had enrolled.

The proposal and decision to remove the appellant.

On February 27, 2024, the agency proposed the appellant's removal based on four charges: (1) Refusal to Drug Test, (2) Failure to Meet a Requirement of

11

Your Testing Designated Position, (3) Lack of Candor, and (4) Violation of Personnel Bulletin 17-15. IAF, Tab 7 at 220-233 (proposal letter).

The appellant responded orally and in writing to Deciding Official Jennifer Madello on March 15, 2024. IAF, Tab 6 at 4-76, 77. The appellant filed a complaint with the Office of Special Counsel (OSC) on March 21, 2024, which was closed on April 30, 2024. IAF, Tab 1 at 35-41 (complaint), at 42 (OSC close-out letter).[8]

On July 17, 2024, Madello notified the appellant that she had reviewed additional information that was not part of the original evidence file and provided him with an opportunity to respond to the additional information. IAF, Tab 5 at 54-55. The appellant responded to the additional information on July 24, 2024. IAF, Tab 5 at 52-53.

On October 15, 2024, Madello issued a written decision sustaining the charges and the penalty. IAF, Tab 5 at 36-49. The agency removed the appellant effective October 18, 2024. IAF, Tab 5 at 35. This timely appeal followed. During the adjudication of this appeal, the agency withdrew charge 2 and charge 3. IAF, Tab 46, ¶ 5.

Burdens of Proof and Applicable Law

1. Whether the agency proved by a preponderance of the evidence the factual basis of the charged misconduct?

2. Whether the agency proved by a preponderance of the evidence a nexus between its charges and the efficiency of the service?

3. Whether the agency proved by a preponderance of the evidence the reasonableness of the selected penalty?

IAF, Tab 36; *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997); 5 C.F.R. § 1201.56(b)(1)(ii).

---

[8] The appellant had until July 5, 2024, to file an Individual Right of Action appeal and there is no evidence he did.

A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.56(b)(1)(ii), 5 C.F.R. § 1201.4(q).

The appellant asserted two affirmative defenses: (1) retaliation for whistleblowing; and (2) disability discrimination based on a theory that the agency failed to accommodate his medical conditions.  IAF, Tab 16; Tab 46, ¶ 6.

Accordingly, I also must adjudicate the following issues with respect to the affirmative defenses:

4. Whether the appellant proved by preponderant evidence that he made a disclosure that is protected by the whistleblower statutes and that the disclosure was a contributing factor in the agency's decision to remove him from his job?

5. If so, whether the agency proved by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure or protected activity?

6. Whether the appellant proved by a preponderance of the evidence that he is a qualified individual with a disability and that his removal was based on the agency's failure to provide a reasonable accommodation for his disability?

IAF, Tab 36; 5 C.F.R. § 1201.56(b)(2)(i)(C).

Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established.  5 C.F.R. § 1209.4(e).  It is a higher standard than preponderant of the evidence.

In this decision, issues of credibility and the weight to be given written statements and other documentary evidence, other than any stipulated facts, have

been resolved by applying the credibility factors articulated in *Hillen*[9] *v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987), as well as the factors governing hearsay weight, as articulated in *Borninkhof*[10] *v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981). *See* IAF, Tab 46, ¶¶ 14, 15. There was no dispute about the reliability of the underlying material documents, and I find they were indeed reliable.

<u>The agency proved Charge 1, Refusal to Drug Test</u>.

In Charge 1, Refusal to Drug Test, the agency charged the appellant as follows:

> On September 27, 2022, you were directed to submit to a random drug test in accordance with the Agency's drug testing program. You refused to complete the test. As a result, the formal result of your drug test was documented as a "Refusal to Test."

IAF, Tab 5 at 41.

As set forth above, the following facts are undisputed. The facts were observed and reported to management by the person administering the drug test (also referred to above as the collector) and admitted to by the appellant at the time of the test and in a subsequent in-person meeting with management.

---

[9] The *Hillen* factors are: (1) the witness' opportunity and capacity to observe the event or act in question; (2) the witness' character; (3) any prior inconsistent statement by the witness; (4) a witness' bias, or lack of bias; (5) the contradiction of the witness' version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness' version of events; and (7) the witness' demeanor. 35 M.S.P.R. at 458.

[10] The *Borninkhof* factors are: (1) the availability of persons with firsthand knowledge to testify at the hearing; (2) whether the statements of the out-of-court declarants were signed or in affidavit form, and whether anyone witnessed the signing; (3) the agency's explanation for failing to obtain signed or sworn statements; (4) whether declarants were disinterested witnesses to the events, and whether the statements were routinely made; (5) consistency of declarants' accounts with other information in the case, internal consistency, and their consistency with each other; (6) whether corroboration for statements can otherwise be found in the agency record; (7) the absence of contradictory evidence; and (8) credibility of declarant when he made the statement attributed to him. 5 M.S.P.R. 77, 87 (1981).

14

The appellant reported for a random drug test on September 27, 2022, as directed. The first urine sample he provided could not be tested because it was outside the allowable temperature range. This temperature problem triggered the need to immediately collect a second sample, as provided by the agency's drug test policy (Personnel Bulletin 17-15). *See also*, IAF, Tab 53 (voicemail from the collector about the need for a second collection). However, because the appellant admitted to the collector that he was trying to cheat the random drug test by using synthetic urine, and showed the collector the bag of synthetic urine strapped to his leg, a second sample was not collected. *See also*, IAF, Tab 52 (voicemail from the collector about "refusal to test"). The appellant offered to stay until he could provide a second urine sample, but the collector sent him back to work and documented the drug test as a "refusal to test."

The appellant argues that he did not "refuse to test" because he offered to remain at the drug testing facility until he could provide another sample. I give no weight to this argument as it is contradicted by the agency's policy and guidance for drug testing, which the appellant was subject to and of which he had prior notice. The policy provides that an attempt to alter or substitute a specimen for a drug or alcohol test is considered a "refusal to take a drug or alcohol test when required." IAF, Tab 8 at 51 (section 18.E); Tab 54-1 (Castelow). It is undisputed that the appellant attempted to substitute his urine with urine from a bag strapped to his leg. Therefore, the agency properly considered the outcome of the appellant's September 27, 2022 random drug test as a "refusal to test."

It also is undisputed that the appellant was properly selected for a random drug test because he held a position that was subject to drug testing. IAF, Tab 8 at 44. The appellant knew he could be randomly drug tested and that marijuana was one of the drugs that would be tested. IAF, Tab 56 (Bennett cross-examination).

Based on the complete record in this appeal, I find that the agency proved by preponderant evidence that the appellant engaged in the misconduct in Charge 1 and I sustain the charge.

The agency proved Charge 4, Violation of Personnel Bulletin 17-15.

In Charge 4, Violation of Personnel Bulletin 17-15, the agency charged the appellant as follows:

> Specification 1: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around September 27, 2022, you admitted to Leroy Campbell, the drug testing collector at the drug testing facility, that you were attempting to cheat the drug test you were directed to take due to potential traces of THC.

> Specification 2: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around October of 2022, you verbally admitted to your supervisor, Nathanial Aldrich that you attempted to foil the drug test coordinator because you had used marijuana.

> Specification 3: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. In a signed statement you provided to your supervisor, Nathanial Aldrich, dated November 22, 2022, you admitted to using marijuana after you accepted your position at SEKI and admitted to using marijuana after work with Nicholas Heath.

IAF, Tab 5 at 43.

As set forth above, the appellant admitted to the conduct in specifications 1-3, each of which is a violation of PB 17-15.

First, it is undisputed that on September 27, 2022, during the random drug test, the appellant admitted to the collector that he was trying to cheat the test. The collector further documented:

> [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19.

I find the collector's statement reliable because it is a signed and certified statement, routinely provided in a Collection Questionnaire by a disinterested witness to a drug test, and corroborated by the voicemail messages the collector left for Aldrich on the same day as the random drug test. The collector's statement is further corroborated by appellant's subsequent admission to Aldrich that he had smoked marijuana since working at SEKI and had been trying to cheat the random drug test. *See Borninkhof*, 5 M.S.P.R. at 87.

Second, it is undisputed that the appellant admitted to Aldrich during an October 2022 meeting that he tried to cheat the random drug test because he had used marijuana. The appellant testified that he told Aldrich why he tried to cheat the random drug test and Aldrich testified to the same.

Third, the undisputed record evidence establishes that the appellant admitted, in writing, that he had used marijuana since starting work at SEKI and had even smoked marijuana, after work, with supervisor Heath. IAF, Tab 8 at 14; Tab 56 (Bennett, re-cross examination).

Based on the above undisputed record evidence, I find the agency proved specifications 1-3 by preponderant evidence, I sustain specifications 1-3, and I sustain Charge 4.

The agency proved nexus.

An adverse action may only be taken for such cause as will promote the efficiency of the service. An adverse action promotes the efficiency of the service, satisfying the nexus requirement, where the grounds for the action relate

17

to either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *See Fontes v. Department of Transportation*, 51 M.S.P.R. 655, 665 n.7 (1991). I find that there is a nexus between the appellant's ability to perform in a designated drug testing position and the efficiency of the service.

It is undisputed that the appellant's occupied a testing designated position and was subject to DOT rules because his position required a valid CDL. The result of a properly administered random drug test in September 2022 was "refusal to test," which itself resulted in the appellant being restricted from duties that required a CDL and/or safety sensitive duties until he completed a substance abuse program. The deciding official concluded that the appellant's admission to using a Schedule 1 controlled substance had a direct and negative relationship to remaining in a testing designated position. The deciding official testified that the appellant's deception at the random drug test eroded her confidence that he could follow the agency's policies and perform his testing designated position duties as expected. IAF, Tab 5 at 45; Tab 55 (Madello). Based on this evidence, I find the agency proved the nexus requirement.

The agency proved the removal penalty was reasonable.

Where, as here, I have sustained all the charged misconduct, I may mitigate the penalty only if it exceeds the tolerable limits of reasonableness or if the agency failed to weigh the relevant factors. *Raco v. Social Security Administration*, 117 M.S.P.R. 1, ¶ 13 (2011).

The factors I must consider, where appropriate, in reviewing the penalty for reasonableness are set forth in *Douglas v. Department of Veterans Administration,* 5 M.S.P.R. 280, 305-06 (1981). While not purporting to be exhaustive, the Board identified the following factors in *Douglas*: (1) the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or

18

inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Id*. If the agency considered all of the relevant *Douglas* factors, I must give due deference to its decision. *Raco*, 117 M.S.P.R. 1, ¶ 13.

Jennifer Madello testified that she was the deciding official for the appellant's removal action. In her notice of decision and at hearing, Madello related some of the *Douglas* factors she considered prior to making her decision. *See* IAF, Tab 5 at 43-47; Tab 55 (Madello).

The deciding official reported that she considered the nature and seriousness of the charges, the fact that the appellant had no prior discipline, that he had a good work record and acceptable performance, the consistency of the penalty with other such offenses, the fact that the appellant knew the rules he was violating, and alternative sanctions. Madello testified that she had no confidence

that the appellant could uphold agency policies in the future, or that a lesser sanction would be adequate, noting that the policies provided the appellant with an opportunity to complete a substance abuse program and return to his duties, but the appellant failed to follow through. She reported that the appellant's deception during the random drug test also showed that he knew he had engaged in conduct that violated the workplace drug program and this eroded her confidence that he could follow the rules. IAF, Tab 55 (Madello).

Madello gave considerable thought to whether the appellant had presented sufficiently mitigating circumstances for his undisputed misconduct. She testified that the appellant's claims that his supervisor used drugs and coached him how to cheat a random drug test, if true, were mitigating circumstances. Madello ultimately decided that the severity of the charged misconduct, together with the appellant's clear notice of the law and agency policies relevant to his TDP position, outweighed any mitigating circumstances. The deciding official ultimately concluded that the appellant made a series of bad choices, from using marijuana while employed by the agency to trying to foil the random drug test. This balance led her to conclude that removal – rather than a suspension or a permanent reassignment to other duties – was the only appropriate penalty. IAF, Tab 55 (Madello, direct examination and cross-examination).

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service. I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal. For these reasons, I find the agency proved that the penalty it sustained was reasonable.

The appellant proved no affirmative defense that requires reversal of the Board's action.

Under 5 U.S.C. § 7701(c)(2), the Board is required to reverse the action of the agency, even where the agency has met its burden of proof, if the appellant shows that the decision was based on any prohibited personnel practice described in 5 U.S.C. § 2302(b), or shows that the decision was not in accordance with law. 5 C.F.R. § 1201.56(c). With respect to a claim of whistleblower retaliation, the Board will reverse the agency's action unless the agency shows by clear and convincing evidence that it would have taken the same action even absent the disclosure or activity. *Campbell v. Department of the Army*, 123 M.S.P.R. 674, ¶ 12 (2016).

The appellant demonstrated through the "knowledge/timing" test that his whistleblowing activity was a contributing factor in the agency's decision to remove him from his TDP position.

The appellant argued that he was removed based on retaliation for making protected disclosures about his supervisor's illegal conduct in the workplace. IAF, Tabs 36, 45, 46. An appellant may assert whistleblower retaliation as an affirmative defense to an agency action. *Campbell*, 123 M.S.P.R. 674, ¶ 11; *Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶ 19 (2013); 5 C.F.R. § 1201.56(b)(2)(i)(C)). In such instances, "[o]nce the agency proves its adverse action case by [the applicable standard], the appellant must show by preponderant evidence that he made a disclosure under 5 U.S.C. § 2302(b)(8) and that the disclosure was a contributing factor in the agency's personnel action." *Shibuya*, 119 M.S.P.R. 573, ¶ 19.

21

Protected whistleblowing occurs when an employee makes a disclosure[11] they reasonably believe evidences any violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial or specific danger to public health and safety. 5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008); *see also Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 10 n.3 (2015) (defining "gross mismanagement" as something more than "management decisions which are merely debatable"; "abuse of authority" as an allegation that a "federal official has arbitrarily or capriciously exercised power which has adversely affected the rights of any person or has resulted in personal gain or advantage to himself or to preferred other persons"; and "gross waste of funds" as "more than [a] debatable expenditure [that] is significantly out of proportion to the benefit reasonably expected to accrue to the government").

Protected whistleblowing also occurs, in relevant part, when an employee exercises an appeal, complaint, or grievance right that is made with regard to remedying a violation of law, rule, or regulation or other type of § 2302(b)(8) disclosure; or discloses information to the Inspector General or Special Counsel, in accordance with applicable provisions of law. 5 U.S.C. § 2302(b)(9)(A)(i), (C).

As discussed above, in November 2022 the appellant reported to upper management that his supervisor smoked marijuana at work, encouraged the appellant to smoke marijuana for pain management, and advised the appellant how to cheat a random drug test. IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett). I find the appellant proved he had a reasonable belief that his supervisor's conduct violated law, rule, and policy prohibiting the use of illegal

---

[11] A whistleblowing "disclosure" is defined at 5 U.S.C. § 2302(a)(2)(D) as a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences (i) any violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety. 5 U.S.C. § 2302(a)(2)(D).

22

drugs at work. The appellant also reported his observations that Heath was an abusive manager to some of his staff. IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett). Here too, I find that the appellant had a reasonable belief that the conduct he reported evidenced a violation of law, rule, or regulation addressing the standards of conduct for Federal employees and the agency's anti-harassment policy. In February 2023, the appellant made these same disclosures to the agency's OIG; and in March 2024, to the OSC. IAF, Tab 1 at 35-41; Tab 44 at 39-42. Thus, I find the appellant proved by preponderant evidence that he engaged in whistleblowing activity under 5 U.S.C. § 2302(b)(9)(A)(i), (C).

Once an employee has proven that they made protected disclosures or engaged in protected activity, they must next show by a preponderance of the evidence that the protected disclosures or activity was a "contributing factor" in the personnel action on appeal. "The most common way of proving the contributing factor element is the 'knowledge/timing test.'" *Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 21 (2016) (citations omitted). Under the knowledge/timing test, "an appellant can prove that [the] disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." *Id*.

An appellant can also show contributing factor by showing that the official who took the action had constructive knowledge of the protected disclosure or activity. *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 11 (2012). The appellant may do so by "demonstrating that an individual with actual knowledge of the disclosure [or protected activity] influenced the official accused of taking the retaliatory action." *Id*. The Board has also held that if an appellant fails to satisfy the knowledge/timing test, the administrative judge must consider "other evidence, such as evidence pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was

personally directed at the proposing or deciding officials, and whether [those] individuals had a desire or motive to retaliate against the appellant." *Id.*, ¶ 15; *see also Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 65.

Based on the complete appeal record, I find no evidence that the proposing official had any awareness of the appellant's disclosures about his supervisor's on-the-job drug use or his OIG complaint. The proposal letter itself makes no express reference to the appellant's whistleblowing activity. *See* IAF, Tab 7 at 220-29. Reynolds did not testify at the hearing, but employee relations specialist Harris testified that Reynolds was selected to be the proposing official because he was outside the appellant's supervisory chain of command and thus a more suitable, impartial proposing official. IAF, Tab 54-6 (Harris). Harris helped Reynolds draft the notice of proposed removal and no one in the appellant's supervisory chain was involved. *Id.*

However, the deciding official testified that she was aware of the appellant's complaints about his immediate supervisor's drug use and harassment of other employees because he told her about it in his written response and discussed it during the oral response. IAF, Tab 6 at 77; Tab 55-3 (Madello, direct examination); Tab 55-4 (Madello, cross examination). This sufficiently demonstrates that the deciding official knew about the appellant's disclosures before she issued the decision removing him, which establishes the contributing factor element based on the "knowledge/timing" test. This means the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action even if it had not known about the whistleblowing.

The agency proved by clear and convincing evidence it would have removed the appellant even if he had not made protected disclosures about workplace drug use and harassment.

Because the appellant has met his initial burden, the Board will reverse that action unless the agency shows by clear and convincing evidence that it would

have taken the same action even absent the disclosure or activity. "In determining whether the agency has met this burden, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated." *Campbell*, 123 M.S.P.R. 674, ¶ 12 (citing *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999)); *see also Whitmore v. Department of Labor*, 680 F.3d 1353, 1365 (Fed. Cir. 2012) (discussing *Carr* factors).

On *Carr* factor 1, the strength of the agency's evidence in support of its action, the Board and Federal Circuit have held that the strength of the agency's evidence is assessed based on the evidence available to it at the time it took the action. *Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 46 (discussing *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1372-73 (Fed. Cir. 2001)). As discussed above, the appellant does not dispute that he engaged in the conduct in Charge 1. His random drug test was reported as a "refusal to test" because he admitted he tried to substitute a bag of urine he purchased for his own urine.

The appellant also admitted he engaged in the conduct in Charge 4. Under the agency's workplace drug policy, PB 17-15, the use of illegal drugs, including marijuana, is not permissible. He admitted he tried to cheat the random drug test because of his marijuana use. The appellant's misconduct was directly related to his duties because he was in a TDP and operated heavy equipment, and knew that his TDP position and the workplace drug policy subjected him to special rules which he disregarded.

On *Carr* factor 2, the existence and strength of any motive to retaliate, there is no evidence that the deciding official was personally motivated to retaliate against the appellant. Madello was an experienced deciding official with

25

no personal knowledge of, or contact with, the appellant until she received his case file. Madello testified candidly that the appellant told her about his whistleblowing activity in his responses but that she did not consider the information in her decision. Instead, she relied on the fact that the appellant knew he was responsible for complying with the agency's policies prohibiting illegal drug use and requiring him to take random drug tests because he was in a TDP position, but made choices antithetical to his responsibilities. I considered the entirety of Madello's testimony very credible. She gave thorough and clear responses to questions from both parties, demonstrated a nuanced understanding of the process of deciding discipline, and was attentive both to the subject matter of the questions as well as potential privacy or confidentiality implications. Her overall hearing demeanor demonstrated integrity and impartiality. *See Hillen*, 35 M.S.P.R. at 458.

Finally, *Carr* factor 3 looks at evidence of similar actions against employees who are not whistleblowers. Here, Madello credibly testified that she was unaware of any employees who refused to test and were not removed.

I have considered the entirety of the record and weighed the credible evidence on each *Carr* factor together to determine whether the evidence is clear and convincing as a whole. *Rickel v. Department of the Navy*, 31 F.4th 1358, 1366 (Fed. Cir. 2022). With the evidence on *Carr* factors 1 and 2 weighing strongly in the agency's favor, I am satisfied that the agency would have removed the appellant had he not made protected disclosures about his supervisor's unlawful conduct. Thus, I conclude that the agency met its clear and convincing burden and the removal action was not retaliation for whistleblowing.

The appellant failed to prove his disability discrimination claim.

The appellant alleged the agency's decision to remove him was disability discrimination based on the failure to provide him with a reasonable accommodation. Specifically, he contends that the agency failed to accommodate

26

his deteriorating vision condition when it did not reassign him to a position at SEKI where he was not required to have or maintain a CDL. IAF, Tab 22 at 9, 17; Tab 23 at 112; Tab 56 (Bennett).

As a Federal employee, the appellant's disability discrimination claim arises under the Rehabilitation Act of 1973. However, the Equal Employment Opportunity Commission (EEOC) regulations implementing the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA), have been incorporated by reference into the Rehabilitation Act, and the Board applies them to determine whether there has been a Rehabilitation Act violation. *Desjardin v. U.S. Postal Service*, 2023 MSPB 6, ¶ 27 (citing *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 35). Only an otherwise qualified individual with a disability is entitled to relief, whether the individual alleges disability discrimination based on a disparate treatment or reasonable accommodation theory. *Id.* (citing *Haas v. Department of Homeland Security*, 2022 MSPB 36, ¶¶ 28-29).

The appellant may prove he has a disability by showing that he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1), (2), (3). The definition of disability is construed in favor of broad coverage. 42 U.S.C. § 12102(4)(A). A physical or mental impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, or any mental or psychological disorder. 29 C.F.R. § 1630.2(h). The test for whether a disability substantially limits the ability of an individual to perform a major life activity is applied as compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii). Major life activities include but are not limited to activities such as caring for oneself, hearing, performing manual tasks, lifting, bending, and working, including the operation of a major bodily function. 29 C.F.R. § 1630.2(i).

27

At the time of his removal, the appellant had been diagnosed with aggressive inflammatory arthritis, an autoimmune disease, and glaucoma and pigment dispersion syndrome. IAF, Tab 7 at 93. Based on the medical evidence he provided, I find the appellant established by preponderant evidence that, at the time of his removal, he had a physical impairment(s) that substantially limited one or more major life activities and was an individual with a disability.

The Rehabilitation Act requires an agency to provide reasonable accommodation to a *qualified* individual with an actual disability or a record of a disability. 29 C.F.R. § 1630.2(o)(4) (emphasis added). To be a qualified employee with a disability who is entitled to a reasonable accommodation for his condition, the appellant must establish that, with or without reasonable accommodation, he can safely perform the essential functions of his position or a vacant position to which he could be reassigned. *Desjardin*, 2023 MSPB 6, ¶ 28.

Having found the appellant is a person with a disability as defined by 29 C.F.R. § 1630.2(g)(1)(i) based on his medical conditions, I now evaluate whether the appellant proved by preponderant evidence that he is a qualified individual with a disability.

In November 2022, the appellant informed Aldrich that his eyesight was deteriorating and he was concerned about his ability to safely perform work that required a CDL. IAF, Tab 54 (Aldrich); Tab 56 (Bennett). Before the conversation with Aldrich, the appellant tried to have conversations with Heath about his chronic physical pain, but Heath avoided the subject because he did not think that an employee's medical information was his business. IAF, Tab 54-2 (Heath); Tab 56 (Bennett).

However, the record is clear that the appellant admitted he was concerned he was going to lose his CDL due to a physical disability as early as October 2022. In a sworn affidavit dated August 31, 2023, the appellant stated that he could not operate heavy machinery, sit for long periods of time, climb, or lift and

28

move heavy objects.  IAF, Tab 7 at 94.  In a letter to Aldrich dated March 23, 2023, the appellant explained:

> My physical impairment is currently related to my vision, specifically my depth perception, preventing me from driving or operating heavy machinery at this time. This directly affects my ability to perform any part of my job duties related to use of my Class A CDL, operation of any heavy machinery or operation of any motor vehicle.

IAF, Tab 7 at 147-148 (March 23, 2023, medical information provided to Aldrich).

I acknowledge that the appellant's statements in March 2023 described his inability to perform his job duties "at this time."  However, the appellant provided no documentary or testimonial evidence that his vision impairment improved such that he could resume the full performance of his duties before the agency removed him.

Further, at no time during his employment did the appellant provide medical documentation to the agency that identified any accommodation that would have allowed the appellant to perform the essential functions of his position.  Nor did the appellant testify that he identified any such accommodations.  He candidly admitted that only a different job would allow him to continue working at SEKI with his disabilities.

Aldrich testified that during the November 2022 meeting with the appellant, the topic came up about other jobs at SEKI that did not require a CDL. The appellant confirmed it was a casual conversation and that he only formally requested reassignment to a different position in March 2023.  IAF, Tab 56 (Bennett); *see also* Tab 7 at 147-148.

It is undisputed that the appellant's position required a Class A CDL to operate heavy machinery.  Preponderant evidence shows that the appellant was no longer able perform those job duties due to his disabilities.  For these reasons, I

29

find that the appellant did not prove he was a qualified individual with a disability to whom the agency had to provide a reasonable accommodation.

In addition, as regards the appellant's request for reassignment, I find that the agency was not required to perform a job search before the appellant demonstrated to the agency that he was fit for continued employment. Aldrich testified that he told the appellant, in November 2022, that any job search was contingent on the appellant completing a SAP. The appellant was aware of this requirement as he admitted that Aldrich told him in October 2022 that he would likely be suspended for his conduct once he completed the SAP, but would face removal if he did not complete a SAP. IAF, Tab 56 (Bennett). I find it entirely reasonable for an employer to wait to conduct a search for a reassignment where an employee must first demonstrate his fitness for continued employment by, for example, following through on a mandatory SAP. *See, e.g., Gena C. v. Department of the Navy*, EEOC Appeal No. 2024002902, 2024 WL 2704605 (May 13, 2024) (An employer is not obligated to consider or grant an employee's request for accommodation that is raised for the first time after the employee has engaged in unacceptable conduct); *see also Elias R. v. Department of Veterans Affairs*, EEOC Appeal No. 2019001826, 2019 WL 7170891 (Nov. 20, 2019) (the EEOC has stated that "reasonable accommodation is always prospective" and thus an agency is not required to excuse past misconduct even if the misconduct was based on the employee's disability.).

Based on this record, I conclude that the appellant was not a qualified individual with a disability when the agency removed him. Further, the agency did not discriminate against the appellant by not reassigning him to a different position as a reasonable accommodation. The appellant's disability discrimination claim, based on failure to accommodate, thus fails.

30

Conclusion

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service. I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal. Further, I find that the agency did not discriminate against the appellant based on a disability or retaliate against him for reporting supervisor misconduct. Accordingly, the agency's removal action is affirmed.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:     *Cynthia B. De Nardi*

                              _____

                              Cynthia B. De Nardi
                              Administrative Judge

### NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. See 5 C.F.R. § 1201.112(a)(4).

### NOTICE TO APPELLANT

This initial decision will become final on **October 23, 2025**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives

31

the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first. The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

32

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents,

33

table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision.  The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

### NOTICE OF LACK OF QUORUM

While administrative judges may continue to issue initial decisions like this one, the Board must have two or more members (known as a quorum) to issue

34

decisions on petitions for review (PFR).   See 5 U.S.C. § 1201; 5 C.F.R. § 1200.3(a), (e). Currently, the Board only has one member, so it is unable to issue any final Board decisions on PFRs. This means that while parties may still file PFRs on initial decisions during this time, no decisions on them will be issued until at least two members are in place, thereby restoring the Board's quorum. Importantly, the absence of a quorum does not extend any deadlines for filing a PFR. Anyone filing a PFR must still meet the deadline outlined above.

## NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review.  Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above.  5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file.  5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction.  If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements.  Failure to file within the

35

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) <u>Judicial review in general</u>.**  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be <u>received</u> by the court within **60 calendar days** of <u>the date this decision becomes final</u>.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3)    Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

38

for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

## CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

<u>Appellant</u>

U.S. Mail

Scott Bennett
550 Dexter Ave
Porterville, California 93257

<u>Appellant Representative</u>

Electronic Service

Dawn Bennett
Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service

Gregory Thornton
Served on email address registered with MSPB

<u>Agency Representative</u>

Electronic Service

Julia Zukina
Served on email address registered with MSPB

_Jacob L Jones_

09/18/2025
(Date)

Jacob L Jones
Paralegal Specialist

FORM 8B. Notice of Unrepresented Person Appearance

Form 8B (p. 1)
March 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## NOTICE OF UNREPRESENTED PERSON APPEARANCE

**Case Number** 2026-1289

**Short Case Caption** Bennett v. Interior

---

**Instructions:** Refer to Federal Circuit Rule 47.3 for requirements governing appearance in this court. Unrepresented persons must immediately file an amended Form 8B if contact information changes. **A motion must be filed to change either the filing or service selection during the pendency of the case.**

Complete page 1 of this form and, if applicable, either page 2 or 3 corresponding to your filing and service selection. **Submit only one of pages 2 or 3; do not submit both.**

---

### ENTRY OF APPEARANCE

I am entering my appearance on my own behalf ("pro se") in the above case.

**Name:** Scott Bennett

**Address:** 550 Dexter Avenue

Porterville, California 93257

**Phone:** 207-812-8476      **Email:** ScottB0213@aol.com

### FILING AND SERVICE SELECTION

I will file all documents in the above case (select only one):

☐ in paper form by mail or in person, and I elect to receive all service by mail only.

☑ through the court's electronic filing system, and I have completed **page 2 (Consent to Electronic Filing and Service)**; I understand I will receive service by email only.

☐ in paper form by mail or in person, and I elect to receive all service by email at the above email address and have completed **page 3 (Consent to Paper Filing and Electronic Service).**

---

I certify that all information is true and correct and that a failure to abide by the above selections may result in my case being delayed or other actions deemed necessary by the court.

Date: 01/08/2026          Signature:

Name:          Scott Bennett

**FORM 5. Petition for Review/Notice of Appeal of an Order or Decision of an Agency, Board, Commission, Office, Bureau, or the US Court of Federal Claims (vaccine appeals only))**

**Form 5**
**March 2023**

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## PETITION FOR REVIEW/NOTICE OF APPEAL

Notice is hereby given that the petitioner(s)/appellant(s) listed below hereby appeal(s) the below-noted case to the United States Court of Appeals for the Federal Circuit.

Originating Tribunal *(Name of Agency, Board, Commission, Office, Bureau, or Court whose decision is being appealed)*:    Merit Systems Protection Board

Case number being appealed:    SF-0752-25-0045-I-1

Case title being appealed:    Scott Bennett (Appellant) v. Dept. of the Interior

Date of final decision or order being appealed:    10/23/2025

Date decision or order was received:    09/18/2025

☑ I have attached a copy of the decision or order being appealed.

**List all Petitioners/Appellants** (List each party filing this appeal.  Do not use "et al." or other abbreviations.  Attach continuation pages if necessary.)

Scott Bennett

Date: 12/20/2025

Signature: 

Name: Scott Bennett

Address: 550 Dexter Avenue

Porterville, CA 93257

Phone Number: 207-812-8476

Email Address: ScottB0213@aol.com

FORM 8A. Entry of Appearance                                    Form 8A (p.1)
                                                               July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### ENTRY OF APPEARANCE

**Case Number:** 26-1289

**Short Case Caption:** Bennett v. Interior

| |
|---|
| **Instructions:** Refer to Fed. Cir. R. 47.3 for requirements governing representation and appearance in this court.  Counsel must immediately file an amended Entry of Appearance if contact information changes and update information through PACER's Manage My Account.  Non-admitted government counsel should enter N/A in lieu of an admission date.  Use the second page to add additional counsel. |

| | | |
|---|---|---|
| **Party Information.** List all parties, intervenors, amicus curiae, or movants represented by below counsel; "et al." is not permitted. | | |
| Department of the Interior | | |
| **Principal Counsel:** Stephen J. Smith | | Admission Date: 05/06/2015 |
| Firm/Agency/Org.: U.S. Department of Justice, Civil Division | | |
| Address: P.O. Box 480, Ben Franklin Station, Washington, DC 20044 | | |
| Phone: (202) 353-0546 | Email: stephen.j.smith@usdoj.gov | |
| **Other Counsel:** | | Admission Date: |
| Firm/Agency/Org.: | | |
| Address: | | |
| Phone: | Email: | |

I certify under penalty of perjury that (1) the submitted information is true and accurate and (2) I am authorized to enter an appearance by all other listed counsel.

Date: 1/15/26

Signature: /s/ Stephen J. Smith

Name: Stephen J. Smith

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**SCOTT BENNETT,**
*Petitioner*

**v.**

**DEPARTMENT OF THE INTERIOR,**
*Respondent*

---

2026-1289

---

Petition for review of the Merit Systems Protection Board in No. SF-0752-25-0045-I-1.

---

**ON MOTION**

---

**O R D E R**

Scott Bennett moves for leave to proceed *in forma pauperis*. The court notes that Mr. Bennett has not submitted his Federal Circuit Form 10, Statement Concerning Discrimination, which is now past due.

Upon consideration thereof,

IT IS ORDERED THAT:

(1) The motion is held in abeyance.

2                                        BENNETT v. INTERIOR

(2)  Mr. Bennett must file his Federal Circuit Form 10 (enclosed) within 21 days of the date of entry of this order. Failure to do so may result in dismissal of this petition for review.  *See* Fed. Cir. R. 15(c)(3).

FOR THE COURT

Jarrett B. Perlow
Clerk of Court

January 22, 2026
        Date

Encl.:  Fed. Cir. Form 10

FORM 10. Statement Concerning Discrimination                    Form 10 (p. 1)
                                                                 December 2025

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## FED. CIR. R. 15(c) STATEMENT CONCERNING DISCRIMINATION

**Case Number:** 2026-1289

**Short Case Caption:** Bennett v. Interior

**Name of Petitioner:** Scott Bennett

---

**Purpose:** This form is to help determine the proper forum for judicial review of a decision of the Merit Systems Protection Board (MSPB) or an Arbitrator, and in particular, those cases in which the federal employee has attributed the adverse employment action, in whole or in part, to bias based on race, color, religion, sex, age, national origin, or handicapping condition, in violation of federal antidiscrimination laws.

This court, while empowered to review MSPB and Arbitrator decisions dealing solely with civil-service claims, lacks authority to decide matters in which claims arising under federal discrimination laws have been asserted and not abandoned. Rather, the proper forum for judicial review of such matters is a federal district court. This form will assist the court in determining whether it needs to transfer a matter to a district court.

**Instructions:** Complete Section A. Complete Sections B and C only as directed by your answer to Section A.

---

## Section A

Before the MSPB or the Arbitrator, did you claim that the adverse employment action (1) was attributable to discrimination on the basis of race, color, religion, sex, age, national origin, or handicapping condition <u>or</u> (2) was retaliation for pursuing Equal Employment Opportunity activity?

☑ Yes (complete Sections B and C)        ☐ No (ignore Sections B and C)

FORM 10. Statement Concerning Discrimination                                    Form 10 (p. 2)
                                                                                December 2025

## Section B

> Complete this section only if you answered "Yes" to the question in Section A.
>
> If you answered "No" to the question in Section A, skip this section.

1. Identify the discrimination claim(s) you raised before the MSPB or Arbitrator.

   > Disability Discrimination (Handicapping Condition) and Age Discrimination.

2. Have you filed a discrimination case in a United States district court from the MSPB's or Arbitrator's decision?

   ☐ Yes     ■ No

   If yes, please identify the case name(s) and number(s) and the status of the case(s) in the box below.

3. Have you filed a discrimination case with the Equal Employment Opportunity Commission from the MSPB's or Arbitrator's decision?

   ■ Yes     ☐ No

   If yes, please identify the case name(s) and number(s) and the status of the case(s) in the box below.

   > 832-2026-00005X - AJ Mulligan dismissed the request for a hearing, NOT the complaint, with leave to reinstate when the federal court case concludes.

**FORM 10. Statement Concerning Discrimination**

**Form 10 (p. 3)**
**December 2025**

## <u>Section C</u>

> Complete this section only if you answered "Yes" to the question in Section A.
>
> If you answered "No" to the question in Section A, skip this section.
>
> Check <u>only one</u> of the boxes below.

☐ Although I did claim that I was discriminated against before the MPSB or the Arbitrator, I wish to abandon those discrimination claims and only pursue civil-service claims in the Federal Circuit rather than pursuing discrimination claims and civil-service claims in district court.  I understand that this means I will not be able to raise the discrimination claims at any later point.

☒ I did claim that I was discriminated against before the MPSB or the Arbitrator and I do <u>not</u> wish to abandon my discrimination claims.

### CERTIFICATION

I certify the above information and any attached sheets (as necessary) are accurate and complete to the best of my knowledge.

Date: 01/22/2026

Signature: _Scott Bennett_

Digitally signed by Scott W. Bennett
Date: 2026.01.22 17:29:36 -08'00'
Adobe Acrobat version:
2025.001.20997

Name: Scott Bennett

NOTE: This order is nonprecedential.

# United States Court of Appeals for the Federal Circuit

———————————

**SCOTT BENNETT,**
*Petitioner*

**v.**

**DEPARTMENT OF THE INTERIOR,**
*Respondent*

———————————

2026-1289

———————————

Petition for review of the Merit Systems Protection Board in No. SF-0752-25-0045-I-1.

———————————

## ON MOTION

———————————

PER CURIAM.

## O R D E R

Scott Bennett moves for leave to proceed *in forma pauperis*. The court considers its jurisdiction over this matter.

Mr. Bennett filed an appeal at the Merit Systems Protection Board challenging the agency's decision to remove him from federal service. The Board affirmed the agency's decision and found that Mr. Bennett failed to prove his claim of disability discrimination. Mr. Bennett now seeks

2                                    BENNETT v. INTERIOR

judicial review of that decision, indicating that he wishes to continue to pursue his claim of discrimination. *See* ECF No. 7 at 3.

Although we have authority to review certain Board decisions, our jurisdiction is limited in a way that may apply here. District courts, not this court, have jurisdiction over "[c]ases of discrimination subject to the provisions of [5 U.S.C. §] 7702," § 7703(b)(2), which involve an allegation of an action appealable to the Board and an allegation that a basis for the action was covered discrimination, 5 U.S.C. § 7702. *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 437 (2017). Where we lack jurisdiction, we shall, if it is in the interest of justice, transfer the case to an appropriate court. 28 U.S.C. § 1631.

Upon consideration thereof,

IT IS ORDERED THAT:

(1) Within 30 days from the date of entry of this order, the parties are directed to address this court's jurisdiction, including whether this petition for review should be dismissed or transferred, and, if transferred, identify an appropriate court.

(2) The motion for leave to proceed *in forma pauperis* is held in abeyance, and these proceedings otherwise are stayed.

FOR THE COURT

Jarrett B. Perlow
Clerk of Court

March 12, 2026
      Date

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| SCOTT BENNETT, )<br><br>Petitioner, )<br>)<br>v. )<br>)<br>DEPARTMENT OF THE INTERIOR, )<br>)<br>Respondent. ) | No. 26-1289 |

## RESPONDENT'S RESPONSE TO SHOW CAUSE ORDER

Respondent, the Department of the Interior, respectfully submits this response

to the Court's March 12, 2026 order to address whether this appeal should be

dismissed or transferred. *See* ECF No. 8 (Order). The appeal by Scott Bennett lies

outside the Court's jurisdiction as this Court lacks jurisdiction over discrimination

claims and mixed cases such as this one. *See, e.g., Perry v. Merit Systems Protection Bd.*,

582 U.S. 420, 422-23 (2017) ("[T]he Federal Circuit, while empowered to review

MSPB decisions on civil-service claims, lacks authority over claims arising under

antidiscrimination laws.") (cleaned up). Mr. Bennett has not abandoned his

discrimination claim, and therefore this Court lacks jurisdiction over this appeal.

*Harris v. Sec. & Exch. Comm'n*, 972 F.3d 1307, 1318 (Fed. Cir. 2020) (citing *Diggs v.

HUD*, 670 F.3d 1353, 1355 n.2 (Fed. Cir. 2011) (explaining that this Court's

jurisdiction is limited to situations where "any claim of discrimination . . . raised

before the Board has been abandoned and will not be raised or continued in this or

any other court") (cleaned up)).  Moreover, although the Court could potentially transfer the case to the United States District Court for the Eastern District of California, such a transfer would be untimely.  As such, the respondent respectfully requests that Mr. Bennett's appeal be dismissed.

## I.    BACKGROUND

Mr. Bennett previously worked for the Department of the Interior (DOI) as an Engineering Equipment Leader with the National Park Services stationed in Sequoia and Kings Canyon National Parks.  SAppx2.[1]  Engineering Equipment Operator Leaders operate heavy equipment and are subject to the Department of Transportation (DOT) drug and alcohol program.  *Id.*  Mr. Bennett suffers from arthritis and vision problems caused by glaucoma and pigment dispersion syndrome.  SAppx9.

### A.    Mr. Bennett's Refusal to Test

On September 27, 2022, Mr. Bennett was unable to complete random drug testing.  Mr. Bennett's sample could not be tested because it was not in the allowable temperature range.  Sappx5.  When informed he would have to retake the test under observation, Mr. Bennett showed the test administrator that he had a bag of urine strapped to his thigh and indicated that he intended to cheat the test.  *Id.*  Per policy, a refusal to test is defined as "a situation where an employee . . . attempts to alter or

---

[1]  "SAppx" refers to the supplemental appendix attached to this response.  The SAppx consists of the board's September 18, 2025 initial decision.

2

substitute a urine sample." SAppx6. Mr. Bennett informed his supervisors and later admitted that he had used marijuana. SAppx7-8.

As a result of the refusal to test, Mr. Bennett was not allowed to perform "safety sensitive" duties including the operation of heavy equipment. SAppx6. Mr. Bennett was also advised to complete a substance abuse program (SAP), and that failure to complete the SAP could result in discipline, including removal. SAppx6-7. Mr. Bennett never completed the SAP. SAppx10.

In March 2023, Mr. Bennett, reiterating previous conversations (SAppx7), informed his supervisor that he was unable to drive and requested reassignment to a position that would not require a commercial driver's license (CDL). SAppx9-10.

**B.      Procedural History**

In November 2022, Mr. Bennett reported allegations of his immediate supervisor's misconduct, alleging that his supervisor used marijuana at work, encouraged Mr. Bennett to do so, and advised Mr. Bennett how to cheat random drug tests. SAppx7. Mr. Bennett also alleged that his immediate supervisor was abusive to the staff. *Id.;* SAppx22.

On February 15, 2023, Mr. Bennett sought Equal Employment Opportunity (EEO) counseling based on allegations that he had been denied accommodation since August 2022. SAppx9. In May 2023, Mr. Bennett subsequently filed a formal EEO complaint including the same allegations. *Id.* Mr. Bennett also submitted to complaints to the DOI's Inspector General alleging supervisory misconduct, including

3

his previously voiced allegations concerning the use of illegal drugs at work. *Id.*

On February 27, 2024, the agency proposed to remove Mr. Bennett for: (1) refusal to drug test, (2) failure to meet a requirement of your testing designated position, (3) lack of candor, and (4) violation of the agency's drug testing policy, Personnel Bulleting 17-15. SAppx10-11; SAppx3-4. Mr. Bennett responded and filed a complaint with the Office of Special Counsel, which was subsequently closed. The charges were sustained and Mr. Bennett was removed on October 18, 2024. SAppx11.

Mr. Bennett subsequently appealed to the Merit Systems Protection Board (board). Charges 2 and 3 were withdrawn during proceedings before the board. *Id.*

## C. The Initial Decision

On September 18, 2025, the administrative judge issued an initial decision affirming Mr. Bennett's removal. SAppx1-39. The board determined that DOI proved the charge of refusal to drug test, noting that it was undisputed and admitted that Mr. Bennett had submitted a sample outside the allowable temperature range and then sought to submit a synthetic urine sample. SAppx13-14. The board rejected Mr. Bennett's argument that he had not "refuse[d] to test" because he offered to provide another sample in light of the DOI testing policy which defined an attempt to submit a false specimen as a "refusal to take a drug or alcohol test when required." SAppx14.

The board also determined that DOI had proved charge 4, violation of drug testing policy Personnel Bulletin 17-15 based on the aforementioned conduct and Mr.

4

Bennett's admissions that he had used marijuana. SAppx16.

The board also determined that DOI had established a nexus and that removal was appropriate. Mr. Bennett's position was subject to DOT drug testing rules and required a valid CDL. SAppx17. The board noted that the "deciding official testified that the appellant's deception at the random drug test eroded her confidence that [Mr. Bennett] could follow the agency's policies and perform his testing designated position duties as expected." *Id.* Regarding removal, the board reasoned that it had sustained all charges and noted that Mr. Bennett had failed to complete the SAP. SAppx18-19.

The board next addressed Mr. Bennett's whistleblower retaliation defense. The board first determined that Mr. Bennett had proved that he had engaged in whistleblower activity based on Mr. Bennett's allegations concerning his immediate supervisor. SAppx22; *see* SAppx7. The board also found that the deciding official was aware of these allegations, and that therefore the whistleblower activity was a contributing factor under the "knowledge/timing" test. SAppx23.

The board determined that DOI would have removed Mr. Bennett regardless of the whistleblower activity. SAppx24-25. The board cited the strength of the evidence, namely that Mr. Bennett had admitted to the conduct underlying both charges. SAppx24. The board also determined that the deciding official had no personal motivation to retaliate against Mr. Bennett, and that all other non-whistleblower employees had been removed for failures to test. SAppx25.

5

Finally, the board rejected Mr. Bennett's disability discrimination claim based on an alleged failure to accommodate his arthritis and glaucoma. The board explained that it was undisputed that Mr. Bennett's position required a CDL to operate heavy machinery, and that Mr. Bennett was unable to perform these responsibilities. Further, Mr. Bennett could not identify any alternative or accommodation that could have afforded Mr. Bennett the ability to perform the essential functions of the position. SAppx28-29. As such, the board determined that Mr. Bennett was unable to prove that he was an individual with a disability to whom the agency had to provide reasonable accommodation. *Id.*

The board also determined that Mr. Bennett's request for reassignment was conditional on Mr. Bennett's ability to demonstrate that he was fit for continued employment with the agency. SAppx29. Here, Mr. Bennett was required to complete an SAP but failed to do so. Thus, the board found it was "entirely reasonable" for DOI to wait to conduct a search for reassignment. *Id.* As such, the board affirmed the DOI's removal action. *Id.* at 30.

Mr. Bennett appealed to this Court on December 22, 2025. ECF No. 1.

## ARGUMENT

The Court should dismiss this appeal because this Court lacks jurisdiction to entertain Mr. Bennett's discrimination claims. Transfer is also inappropriate. Had Mr. Bennett appealed to a district court, the appeal would have been untimely.

6

## I.   Because Mr. Bennett Has Not Abandoned His Discrimination Claims, This Court Lacks Jurisdiction

This Court's jurisdiction to review decisions of the board does not extend to cases that involve claims of discrimination. *See, e.g.*, *Perry*, 582 U.S. at 422-23 ("[T]he Federal Circuit, while empowered to review MSPB decisions on civil-service claims, lacks authority over claims arising under antidiscrimination laws." (citations omitted)). Mr. Bennett's statement concerning discrimination, ECF No. 7 at 2-3 reiterates that he wishes to continue to pursue his discrimination claims. *Id.* The law is clear that this Court does not have jurisdiction over discrimination claims or mixed cases. *See Perry*, 582 U.S. 422-23; *see also Harris*, 972 F.3d at 1318 ("[W]hereas the Board has jurisdiction to hear appeals of mixed cases, we do not."); *Higgins v. Dep't of Veterans Affs.*, 955 F.3d 1347, 1353 (Fed. Cir. 2020). Thus, Mr. Bennett's petition for review should be dismissed for lack of subject matter jurisdiction. *See, e.g.*, *Bunch v. United States*, 78 F.3d 605 (Fed. Cir. 1996); *Pollack v. United States*, 498 F. App'x 19, 22 (Fed. Cir. 2012).

## II.   This Case Should Be Dismissed as Transfer Would Be Untimely

### A.   Mr. Bennett's Appeal to The District Court Would Have Been Untimely

The untimeliness of Mr. Bennett's appeal also renders transfer inappropriate. While a Court may transfer an appeal for which it lacks jurisdiction to the court in which the "appeal could have been brought at the time it was filed or noticed" in the interests of justice, 28 U.S.C. § 1631, here Mr. Bennett's appeal of the MSPB's decision to a district court would be untimely.

An appeal involving a discrimination claim "must be filed within 30 days" of the decision becoming final. *See* 5 U.S.C. § 7703(b)(2); SAppx36. Here, the board issued its initial decision on September 18, 2025 and became final on October 23, 2025. SAppx1, 30. Therefore Mr. Bennett's deadline to appeal was November 24, 2025.[2] *See* 5 U.S.C. § 7703(b)(1)(A). But Mr. Bennett did not file his petition for review until December 22, 2025. *See* ECF No. 1.

Accordingly, Mr. Bennett's appeal to the district court would be untimely and this appeal should therefore be dismissed.

**B.    The Deadline to Appeal Is Not Subject to Equitable Tolling**

Equitable tolling is not available to extend the deadline to appeal a final MSPB decision and cannot save Mr. Bennett's untimely appeal.

By statute, and as discussed above, appeals involving claims of discrimination to the district court "must be filed within 30 days." 5 U.S.C. § 7703(b)(2). This "mandatory language . . . creates an obligation impervious to discretion." *Maine Cmty. Health Options*, 590 U.S. at 310 (cleaned up). It is exactly the sort of "unusually emphatic" language that precludes "plausibly read[ing the statute] as containing an implied 'equitable tolling' exception." *Oja v. Dep't of Army*, 405 F.3d 1349, 1358 (Fed. Cir. 2005) (quoting *United States v. Brockamp*, 519 U.S. 347, 350 (1997)).

The Federal Rules of Appellate Procedure also make clear that the 30-day

---

[2]    30 days from October 23, 2025 was Saturday, November 22, 2025.

deadline to appeal a final MSPB decision may not be equitably tolled.  Specifically, Federal Rule of Appellate Procedure 26(b)(2) makes clear that "the court may not extend the time to file . . . a petition to . . . review an order of an administrative agency, board, commission, or officer of the United States."  Fed. R. App. P. 26(b).  "In other words, Appellate Rule 26(b) says that the deadline for the precise type of filing at issue here may not be extended."  *Nutraceutical Corp. v. Lambert*, 586 U.S. 188, 193 (2019).

Accordingly, equitable tolling does not apply to the statutory deadline to appeal a final MSPB decision and cannot save petitioner's untimely appeal from dismissal.

## C.    Equitable Tolling Is Not Available to Petitioner

Even if the deadline to appeal a final MSPB decision were subject to equitable tolling, such relief still would not be available to Mr. Bennett here.  "Federal courts have typically extended equitable relief only sparingly," *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990), and a petitioner "seeking equitable tolling bears the burden of establishing two elements:  (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing.  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005).

Here, Mr. Bennett has not established—and could not establish—"that some extraordinary circumstance stood in his way."  *Id.*  Mr. Bennett was informed that the deadline to appeal a case involving a claim of discrimination was 30 calendar days.  SAppx36.  He did not follow this instruction and provides no excuse.  As such, Mr.

9

Bennett's appeal cannot be transferred and should instead be dismissed. *See, e.g.,*

*Howard v. United States R.R. Retirement Bd.*, 2017-2251, 2017 U.S. App. LEXIS 28901,

\*2 (Fed. Cir. Sept. 8, 2017) ("While this court may transfer a case to another 'court in

which the action or appeal could have been brought at the time it was filed . . .

because [appellant's] appeal was untimely, and therefore, could have not been brought

in the regional circuit at the time it was filed, we grant the Board's motion to

dismiss."); *Gist v. United States*, 504 F. Appx 918, 918-919 (Fed. Cir. 2013) ("[S]ince

Gist's appeal is untimely, a transfer would not be in the interest of justice and instead

dismissal is warranted.").

This Court may elect to consider transfer "if it is in the interest of justice." 28

U.S.C. § 1631; Order at 2. Here, the district court with likely jurisdiction is the United

States District Court for the Eastern District of California, because the underlying

conduct occurred in Sequoia and Kings Canyon National Parks which is primarily

located in Tulare County, California. Accordingly, in the event this "mixed case" is not

dismissed, it should be transferred to district court.

## CONCLUSION

For these reasons, we respectfully request that this Court dismiss Mr. Bennett's

appeal.

TODD BLANCHE
Acting Attorney General

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

/s/ *Stephen J. Smith*
STEPHEN J. SMITH
Trial Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 353-0546
Email: Stephen.J.Smith@usdoj.gov
Attorneys for Respondent

April 13, 2026                    Attorneys for Respondent

11

CERTIFICATE OF COMPLIANCE

I certify that, pursuant to Fed. R. App. Procedure 32(g), this motion complies with the type-volume limitation.  This motion was prepared using Microsoft Word, Garamond, 14-point font.  In making this certification, I have relied upon the word count function of the Microsoft Word software application used to prepare this motion.  According to the word count, this motion contains 2323 words.

/s/ *Stephen J. Smith*
STEPHEN J. SMITH
Trial Attorney
April 13, 2026

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WESTERN REGIONAL OFFICE**

| | |
|---|---|
| SCOTT BENNETT,<br>　　　　　Appellant, | DOCKET NUMBER<br>SF-0752-25-0045-I-1 |
| v. | |
| DEPARTMENT OF THE INTERIOR,<br>　　　　　Agency. | DATE: September 18, 2025 |

Dawn Bennett, Porterville, California, for the appellant.

Gregory James Thornton, Washington, D.C., for the agency.
Julia Zukina, Washington, D.C., for the agency.

**BEFORE**
Cynthia B. De Nardi
Administrative Judge

**INITIAL DECISION**

**INTRODUCTION**

On October 21, 2024, the appellant timely appealed the agency's removal action.  Initial Appeal File (IAF), Tab 1.  The Board has jurisdiction.  5 U.S.C. §§ 7511-7513, 7701(a).  On April 3, 2025, the appeal was reassigned to me.  IAF, Tab 42.  I held the appellant's requested hearing by video conference in May 2025, and the record closed on May 27, 2025.  IAF, Tabs 54-57.[1]

For the reasons discussed below, the agency's action is AFFIRMED.

---

[1] IAF, Tab 54 is the hearing audio for May 7, 2025.  IAF, Tab 55 is the hearing audio for May 8, 2025.  IAF, Tab 56 is the hearing audio for May 13, 2025.  IAF, Tab 57 is the hearing audio for the parties' closing arguments and my closing of the record.

2

## ANALYSIS AND FINDINGS

Background

At the time of his removal, the appellant worked for the agency as an Engineering Equipment Operator Leader, WL-5716-10, with the National Park Services, Division of Maintenance and Construction, duty stationed at the Sequoia and Kings Canyon National Parks (SEKI) in Three Rivers, California. IAF, Tab 5 at 35. The appellant transferred to SEKI in September 2021 after working for about 10 years at Acadia National Park in Maine. IAF, Tab 8 at 24; Tab 56 (Bennett).

At the times relevant to this appeal, the appellant's supervisors at SEKI were Nicholas Heath, Roads Supervisor, Nathan Aldrich, Facility Manager, and Rick Hall, Chief of Facilities and Construction.

Requirements of the appellant's position

An Engineering Equipment Operator Leader operates heavy equipment for the maintenance of the park's roads and parking lots and provides daily direction to a staff to accomplish this work. IAF, Tab 8 at 26. The position requires the incumbent to have a commercial driver's license (CDL), which the appellant had. IAF, Tab 8 at 25 (Position description provides: "Must maintain a valid Class A Commercial Drivers License with air brakes and hazardous materials endorsement."); Tab 54-5 (Hall); Tab 56 (Bennett).

The appellant's position subjects him "to the requirements of the Department of Transportation (DOT) drug and alcohol testing program" and "is a Testing Designated Position (TDP) under the Department of the Interior Drug-Free Workplace Program." IAF, Tab 8 at 25-26. The appellant's appointment document also notes the Engineering Equipment Operator Leader is a "position subject to drug testing." IAF, Tab 8 at 24 (block 45). The appellant did not dispute that having a CDL is a requirement of his position or that the position is subject to random drug testing.

3

The agency's drug test program: Personnel bulletin 17-15

Personnel bulletin 17-15 (PB 17-15) is the Interior Department's policy and guidance for drug and alcohol testing.  IAF, Tab 8 at 39-57 (Drug-Free and Alcohol-Free Workplace Plan).  The following provisions of the policy are relevant to the issues in this appeal:

- A TDP, among others, is one covered by the Omnibus Transportation Employee Testing Act of 1991, which means that the incumbent is subject to [DOT] rules, *e.g.* commercial driver's license holders (CDL).  IAF, Tab 8 at 41 (Section 3.D.6), 55 (endnote ii); Tab 54-1 (Castlelow).
- TDPs are subject to selection for random drug testing.  IAF, Tab 8 at 41, 43-44 (section 6.A).
- An individual selected for random testing will be notified the same day the test is scheduled, preferably within two hours of the scheduled testing.  The individual's supervisor should explain to the employee that he/she is under no suspicion of taking drugs and that the employee's name was selected randomly.  IAF, Tab 8 at 47 (section 14.C).
- Employees who are referred through administrative channels to undergo counseling or rehabilitation programs for illegal drug use will be subject to unannounced testing, both during and after such a program.  IAF, Tab 8 at 44 (section 6.E).
- The agency authorizes a direct observed collection when a donor's previous drug test result was reported by the [Medical Review Officer] as drug positive, adulterated, substituted, invalid without a legitimate medical reason or cancelled because the split specimen failed to reconfirm the primary specimen results or could not be tested.  IAF, Tab 8 at 45 (section 9.A).
- At the collection site, an immediate collection of a second urine sample is required in one of the following situations: (1) The temperature of the specimen collected during a routine collection is outside the acceptable temperature range [ . . .].  IAF, Tab 8 at 45 (section 9.B(1)).
- Failure to appear for testing without a deferral will be considered refusal to participate in testing.  Employees may be subjected to the full range of disciplinary actions, including removal from Federal service, if they refuse to be tested.  If the employee is not removed, he or she will be referred to the [Employee Assistance Program] and required to submit to follow-up testing.  IAF, Tab 8 at 46 (section 10).

- Mandatory Administrative Action. The agency shall refer an employee found to use/possess illegal drugs or to use/possess alcohol on duty to the [Employee Assistance Program/Substance Abuse Program]. Employees found to use/possess illegal drugs or to use/possess alcohol on duty (for employees covered by the Omnibus Transportation Employee Testing Act of 1991) will not be allowed to remain on duty in a TDP until successful completion of a rehabilitation program through EAP/SAP. At the discretion of DOI, and as part of an EAP rehabilitation program, an employee may return to duty in a TDP if the employee's return would not endanger public health or safety or national security.  IAF, Tab 8 at 50 (section 18.B).
- Employees referred through administrative channels who undergo a counseling or rehabilitation program for illegal drug use through the EAP or SAP will be subject to unannounced testing for 1 year; a return-to-duty test is required for any employee in a position covered by the Omnibus Transportation Employee Testing Act of 1991.  IAF, Tab 8 at 49-50 (section 17.B).
- A refusal to take a drug or alcohol test when required includes "[a]ttempts to alter or substitute the specimen provided."  IAF, Tab 8 at 51 (section 18.E(3)).

The policy defines "illegal drugs" as both Schedule I and Schedule II controlled substances, which includes marijuana.  IAF, Tab 8 at 40, 41 (sections 3.B, 4.B(3)).  In this decision, marijuana is also referred to as "THC" which denotes the main active compound in the cannabis or marijuana plant.[2]

The random drug test in September 2022.

On September 13, 2022, six SEKI employees, including the appellant, were randomly selected for drug testing.  IAF, Tab 8 at 20.  The appellant's direct supervisor, Nicholas Heath, told him to report to the testing facility on September 27, 2022 for a random drug test.  IAF, Tab 54-2 (Heath); Tab 56 (Bennett).[3]

---

[2]  https://www.mayoclinic.org/drugs-supplements-marijuana/art-20364974 (last viewed September 17, 2025).

[3] Testimony about what else Heath may have told Bennett in advance of the random drug test is disputed.  Bennett testified that Heath gave him specific advice for how to cheat the drug test, which he followed; Heath denied Bennett's account.  Whether Heath advised the appellant on how to cheat the drug test, including where to buy synthetic

The appellant reported to the drug testing facility on September 27, 2022. He provided a urine sample that could not be tested because it was not in the allowable temperature range. As dictated by the agency's Drug-Free Workplace policy, when the temperature of the specimen collected during a routine collection is outside the acceptable temperature range, an immediate collection of a second urine sample is required. IAF, Tab 8 at 45.

The collector informed the appellant he would have to provide a viable urine specimen under observed conditions and had to remain at the testing facility for up to three hours in order to provide the specimen. IAF, Tab 8 at 19. But then the appellant showed the collector that he had a bag of urine strapped to his thigh:

> Upon observation, [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19 (the collector's statement).

The collector left Aldrich two voicemail messages about (1) the need to conduct a second, observed collection from the appellant due to a "non-temp" and (2) why the result of the second, observed collection was a "refusal to test." The voicemails were forwarded to Hall who provided them to Supervisory Drug Program Specialist Bryan Castelow and Elisha Harris in Human Resources. IAF, Tab 52-53 (voicemail messages); Tab 54-5 (Hall).

The appellant testified consistently with the collector's documented observation; that is, he admitted that he showed the collector the bag of urine strapped to his leg and admitted that he was trying to cheat the drug test. The appellant recalled that the collector was "disappointed." IAF, Tab 56 (Bennett). Although the appellant offered to stay at the testing facility until he could provide

---

urine to pass off as his own, is not material to my determining whether the agency proved the charged misconduct. For this reason, I will not decide which witness testified more credibly on this topic, although I found, overall, the appellant a very credible witness.

his own urine for a second drug test, the collector told him he could leave and return to work. *Id*. The appellant returned to work and told Heath what happened.[4] IAF, Tab 56 (Bennett).

It is undisputed that the drug testing policy defines a refusal to test to include a situation where an employee is either unwilling or unable to provide a second specimen, or where an employee attempts to alter or substitute a urine sample. IAF, Tab 54-1 (Castelow); Tab 8 at 51 (section E).

Castelow advised Hall to restrict the appellant from safety sensitive duties and initiate some type of disciplinary proceedings. IAF, Tab 8 at 15-16. According to Hall, Castelow also advised that if management wanted to retain the appellant, he would have to complete a substance abuse program. IAF, Tab 54-5 (Hall).

The appellant's October 2022 meeting with Aldrich.

The appellant's first and second line supervisors, Heath and Aldrich, met with him on October 3, 2022, about the "refusal to test." IAF, Tab 54-3 (Aldrich); Tab 56 (Bennett). The appellant admitted that he tried to cheat the random drug test. The appellant also admitted that he had used marijuana since becoming a SEKI employee, but never while at work. *Id*. The appellant acknowledged that Aldrich and Heath told him he could not operate equipment that required a Class A CDL. IAF, Tab 56 (Bennett). There is a dispute over whether the supervisors explicitly told the appellant that he was restricted from performing "safety sensitive" duties until further notice or provided him a list of the "safety sensitive" duties from which he was restricted. *See* IAF, Tab 56 (Bennett). This distinction, however, is not material to the issues I must adjudicate in this appeal.

---

[4] The appellant testified that Heath asked him if he had the air conditioner on when he drove to the testing facility, and when the appellant said "yes," Heath responded, "that's where you went wrong." IAF, Tab 56 (Bennett).

Finally, Aldrich informed the appellant that if he failed to complete a substance abuse program (SAP) he could face serious discipline, including removal from his position. They discussed a program that Aldrich personally recommended, Recovery Resources, located in Visalia, CA. IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

The appellant's November 2022 meeting with Aldrich and Hall.

The appellant met with his second and third line supervisors, Aldrich and Hall, in November 2022 to discuss what the appellant believed was workplace misconduct by first line supervisor, Heath. IAF, Tab 54-3 (Aldrich); Tab 54-5 (Hall); Tab 56 (Bennett); *see also* Tab 45 at 115. Aldrich took notes at the meeting but also asked the appellant to put his complaint in writing so he could look into it. *See* IAF, Tab 7 at 260. Aldrich testified consistently with his notes that the appellant reported Heath smoked marijuana at work, asked the appellant to smoke marijuana with him at work, and suggested the appellant use synthetic urine to cheat the random drug test and told him where he could buy it.[5] *Id*.; *see also* IAF, Tab 45 at 115-16. The appellant also reported that Heath harassed and micromanaged other members of the crew and may have misused a government credit card. IAF, Tab 7 at 24-25.

During this meeting, the appellant also told Aldrich that his vision was deteriorating and that he had a "near crash" while driving to work.[6] The appellant

---

[5] Heath denied smoking marijuana with or in front of the appellant or encouraging him to smoke it for medical reasons. IAF, Tab 54-2 (Heath). Whether or not the appellant's disclosure about Heath using illegal drugs is true is not material to any of the issues I must decide in this appeal. For this reason, I will not decide which witness testified more credibly, although as I noted above, I found the appellant to be overall a very credible witness.

[6] The appellant testified that he was on approved leave from July 4-August 21, 2022, while he sought treatment from specialists after he had a "near miss" while driving. IAF, Tab 56 (Bennett). It is unclear whether the "near crash" the appellant told Aldrich about was the same as the "near miss" that preceded his medical leave in the summer of 2022. However, by November 2022, the appellant's vision condition was indisputably interfering with his ability to drive safely.

was worried about whether he would be able to keep his Class A CDL. IAF, Tab 54 (Aldrich); Tab 56 (Bennett). Aldrich testified that he told the appellant that once the appellant completed the SAP, they could discuss other positions at SEKI for him that did not require a CDL. IAF, Tab 54 (Aldrich). The appellant testified that Aldrich suggested the possibilityy of other positions at SEKI for him that did not require a CDL. IAF, Tab 56 (Bennett).

November 2022 – February 2023 – the appellant and the Substance Abuse Program.

The appellant started attending an intensive outpatient program (IOP) at Recovery Resources on October 18, 2022. IAF, Tab 8 at 6; Tab 56 (Bennett).

Starting in December 2022, Aldrich asked the appellant several times for a status update on his participation in a SAP. IAF, Tab 8 at 13; Tab 54 (Aldrich). Aldrich understood from the appellant that he was participating in a SAP one day a week. IAF, Tab 54 (Aldrich); Tab 56 (Bennett).

By letter dated February 14, 2023, Aldrich asked the appellant to respond and provide documentation, and also informed the appellant:

> Please note, you currently occupy a position which has duties classified as DOT safety-sensitive duties. In order to perform these safety-sensitive duties you must receive an SAP evaluation and successfully comply with the SAP's evaluation recommendations. Therefore, you will not be authorized to return to safety-sensitive duties until the SAP return-to-duty process is successfully completed.

IAF, Tab 8 at 13.

Thus, as of the February 14, 2023, letter to the appellant, Aldrich had no evidence that the appellant had either participated in or completed a SAP. IAF, Tab 54 (Aldrich). On February 20, 2023, the appellant responded to Aldrich. He declined to provide SAP documentation until Aldrich provided him with evidence that he was facing disciplinary action and had agreed to participate in a SAP. However, the appellant offered to submit to an observed urine test any time. The

appellant's view was that he never refused to submit to a drug test but that the collector refused to test him.  IAF, Tab 8 at 8-9.

February 2023 – EEO and Inspector General complaints.

On February 15, 2023, the appellant sought equal employment opportunity (EEO) counseling, alleging in part that he had been denied reasonable accommodation since August 2022.  IAF, Tab 5 at 25.  He filed a formal EEO complaint in May 2023 which included the failure to accommodate claim.  *Id*. at 26-27.

On the same date, the appellant submitted two complaints to the Department of Interior's Inspector General (IG) about supervisory misconduct.[7] IAF, Tab 44 at 39-45.  The Department of Interior notified the appellant that it referred his redacted complaints to the National Park Service.  *Id*. at 46.

The appellant's medical conditions.

At all times relevant to this appeal, the appellant had two primary medical conditions: joint pain caused by aggressive inflammatory arthritis and vision problems caused by glaucoma and pigment dispersion syndrome.  IAF, Tab 7 at 93-94; Tab 56 (Bennett).  The appellant moved to California because the climate would be more favorable for his arthritis symptoms.  IAF, Tab 56 (Bennett). When the appellant was an Acadia Park employee, he used prescription oxycodone, for which he had documentation from his treating physician that deemed him "able to perform safety-sensitive duties while on his current medication as prescribed."  IAF, Tab 7 at 132; Tab 56 (Bennett).

March 2023 – the appellant requests reassignment.

In March 2023, the appellant informed Aldrich that he was "unable to drive at all" pending his upcoming appointments with a neurologist and

---

[7] The OIG complaints included the appellant's disclosures that Heath used marijuana on the job and while retaining a Class A CDL and abused a government credit card.  IAF, Tab 44 at 40, 43.

ophthalmologist and he requested "reassignment to another position" that would not require a CDL or could be performed with a waiver for the CDL. He also provided the 2020 and 2021 documentation from his treating physician that he could perform safety sensitive duties while taking oxycodone as prescribed. IAF, Tab 7 at 147-48; Tab 8 at 9-10; Tab 56 (Bennett).

The appellant also sent Aldrich information related to a SAP in which he had participated. The discharge summary reflects that the appellant was admitted to Recovery Resources on October 15, 2022, and discharged 30 days later. IAF, Tab 8 at 5-6. The appellant testified that he left the SAP when he did because, together with his work hours, his days were very long and he was in significant pain from sitting for too long. IAF, Tab 56 (Bennett). The appellant testified that he worked out an arrangement with Recovery Resources to see his counselor on his days off. He believed that this alternate arrangement was permissible because Recovery Resources was aware of the plan. *Id*. There is no evidence that when the appellant made this alternate arrangement for drug counseling, he informed Aldrich or anyone else at SEKI of his plan.

Supervisory Drug Program Specialist Bryan Castelow contacted the Recovery Resources facility to verify the appellant's participation in a SAP. He was told that: (1) the IOP is 8 weeks long with 24 mandatory sessions; (2) the appellant left the program before he completed the IOP; and (3) there was no record of any SAP assessment for the appellant. IAF, Tab 54-1 (Castelow); *see also* Tab 8 at 4.

It is undisputed that the appellant did not complete the same 8-week intensive outpatient program in which he had enrolled.

The proposal and decision to remove the appellant.

On February 27, 2024, the agency proposed the appellant's removal based on four charges: (1) Refusal to Drug Test, (2) Failure to Meet a Requirement of

Your Testing Designated Position, (3) Lack of Candor, and (4) Violation of Personnel Bulletin 17-15.  IAF, Tab 7 at 220-233 (proposal letter).

The appellant responded orally and in writing to Deciding Official Jennifer Madello on March 15, 2024.  IAF, Tab 6 at 4-76, 77.  The appellant filed a complaint with the Office of Special Counsel (OSC) on March 21, 2024, which was closed on April 30, 2024.  IAF, Tab 1 at 35-41 (complaint), at 42 (OSC close-out letter).[8]

On July 17, 2024, Madello notified the appellant that she had reviewed additional information that was not part of the original evidence file and provided him with an opportunity to respond to the additional information.  IAF, Tab 5 at 54-55.  The appellant responded to the additional information on July 24, 2024.  IAF, Tab 5 at 52-53.

On October 15, 2024, Madello issued a written decision sustaining the charges and the penalty.  IAF, Tab 5 at 36-49.  The agency removed the appellant effective October 18, 2024.  IAF, Tab 5 at 35.  This timely appeal followed.  During the adjudication of this appeal, the agency withdrew charge 2 and charge 3.  IAF, Tab 46, ¶ 5.

Burdens of Proof and Applicable Law

1. Whether the agency proved by a preponderance of the evidence the factual basis of the charged misconduct?

2. Whether the agency proved by a preponderance of the evidence a nexus between its charges and the efficiency of the service?

3. Whether the agency proved by a preponderance of the evidence the reasonableness of the selected penalty?

IAF, Tab 36; *Pope v. U.S. Postal Service*, 114 F.3d 1144, 1147 (Fed. Cir. 1997); 5 C.F.R. § 1201.56(b)(1)(ii).

---

[8] The appellant had until July 5, 2024, to file an Individual Right of Action appeal and there is no evidence he did.

12

A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue.  5 C.F.R. § 1201.56(b)(1)(ii), 5 C.F.R. § 1201.4(q).

The appellant asserted two affirmative defenses: (1) retaliation for whistleblowing; and (2) disability discrimination based on a theory that the agency failed to accommodate his medical conditions.  IAF, Tab 16; Tab 46, ¶ 6.

Accordingly, I also must adjudicate the following issues with respect to the affirmative defenses:

4. Whether the appellant proved by preponderant evidence that he made a disclosure that is protected by the whistleblower statutes and that the disclosure was a contributing factor in the agency's decision to remove him from his job?

5. If so, whether the agency proved by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure or protected activity?

6. Whether the appellant proved by a preponderance of the evidence that he is a qualified individual with a disability and that his removal was based on the agency's failure to provide a reasonable accommodation for his disability?

IAF, Tab 36; 5 C.F.R. § 1201.56(b)(2)(i)(C).

Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established.  5 C.F.R. § 1209.4(e).  It is a higher standard than preponderant of the evidence.

In this decision, issues of credibility and the weight to be given written statements and other documentary evidence, other than any stipulated facts, have

been resolved by applying the credibility factors articulated in *Hillen*[9] *v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987), as well as the factors governing hearsay weight, as articulated in *Borninkhof*[10] *v. Department of Justice*, 5 M.S.P.R. 77, 83-87 (1981).  *See* IAF, Tab 46, ¶¶ 14, 15.  There was no dispute about the reliability of the underlying material documents, and I find they were indeed reliable.

The agency proved Charge 1, Refusal to Drug Test.

In Charge 1, Refusal to Drug Test, the agency charged the appellant as follows:

> On September 27, 2022, you were directed to submit to a random drug test in accordance with the Agency's drug testing program. You refused to complete the test. As a result, the formal result of your drug test was documented as a "Refusal to Test."

IAF, Tab 5 at 41.

As set forth above, the following facts are undisputed. The facts were observed and reported to management by the person administering the drug test (also referred to above as the collector) and admitted to by the appellant at the time of the test and in a subsequent in-person meeting with management.

---

[9] The *Hillen* factors are: (1) the witness' opportunity and capacity to observe the event or act in question; (2) the witness' character; (3) any prior inconsistent statement by the witness; (4) a witness' bias, or lack of bias; (5) the contradiction of the witness' version of events by other evidence or its consistency with other evidence; (6) the inherent improbability of the witness' version of events; and (7) the witness' demeanor.  35 M.S.P.R. at 458.

[10] The *Borninkhof* factors are: (1) the availability of persons with firsthand knowledge to testify at the hearing; (2) whether the statements of the out-of-court declarants were signed or in affidavit form, and whether anyone witnessed the signing; (3) the agency's explanation for failing to obtain signed or sworn statements; (4) whether declarants were disinterested witnesses to the events, and whether the statements were routinely made; (5) consistency of declarants' accounts with other information in the case, internal consistency, and their consistency with each other; (6) whether corroboration for statements can otherwise be found in the agency record; (7) the absence of contradictory evidence; and (8) credibility of declarant when he made the statement attributed to him.  5 M.S.P.R. 77, 87 (1981).

The appellant reported for a random drug test on September 27, 2022, as directed. The first urine sample he provided could not be tested because it was outside the allowable temperature range. This temperature problem triggered the need to immediately collect a second sample, as provided by the agency's drug test policy (Personnel Bulletin 17-15). *See also*, IAF, Tab 53 (voicemail from the collector about the need for a second collection). However, because the appellant admitted to the collector that he was trying to cheat the random drug test by using synthetic urine, and showed the collector the bag of synthetic urine strapped to his leg, a second sample was not collected. *See also*, IAF, Tab 52 (voicemail from the collector about "refusal to test"). The appellant offered to stay until he could provide a second urine sample, but the collector sent him back to work and documented the drug test as a "refusal to test."

The appellant argues that he did not "refuse to test" because he offered to remain at the drug testing facility until he could provide another sample. I give no weight to this argument as it is contradicted by the agency's policy and guidance for drug testing, which the appellant was subject to and of which he had prior notice. The policy provides that an attempt to alter or substitute a specimen for a drug or alcohol test is considered a "refusal to take a drug or alcohol test when required." IAF, Tab 8 at 51 (section 18.E); Tab 54-1 (Castelow). It is undisputed that the appellant attempted to substitute his urine with urine from a bag strapped to his leg. Therefore, the agency properly considered the outcome of the appellant's September 27, 2022 random drug test as a "refusal to test."

It also is undisputed that the appellant was properly selected for a random drug test because he held a position that was subject to drug testing. IAF, Tab 8 at 44. The appellant knew he could be randomly drug tested and that marijuana was one of the drugs that would be tested. IAF, Tab 56 (Bennett cross-examination).

Based on the complete record in this appeal, I find that the agency proved by preponderant evidence that the appellant engaged in the misconduct in Charge 1 and I sustain the charge.

The agency proved Charge 4, Violation of Personnel Bulletin 17-15.

In Charge 4, Violation of Personnel Bulletin 17-15, the agency charged the appellant as follows:

> Specification 1: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around September 27, 2022, you admitted to Leroy Campbell, the drug testing collector at the drug testing facility, that you were attempting to cheat the drug test you were directed to take due to potential traces of THC.

> Specification 2: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. On or around October of 2022, you verbally admitted to your supervisor, Nathanial Aldrich that you attempted to foil the drug test coordinator because you had used marijuana.

> Specification 3: Pursuant to Personnel Bulletin (PB) 17-15, the use of illegal drugs, whether on or off duty, will not be tolerated. An illegal drug under the policy includes marijuana, as it is a controlled substance under Schedule I as defined by the Controlled Substances Act. In a signed statement you provided to your supervisor, Nathanial Aldrich, dated November 22, 2022, you admitted to using marijuana after you accepted your position at SEKI and admitted to using marijuana after work with Nicholas Heath.

IAF, Tab 5 at 43.

As set forth above, the appellant admitted to the conduct in specifications 1-3, each of which is a violation of PB 17-15.

First, it is undisputed that on September 27, 2022, during the random drug test, the appellant admitted to the collector that he was trying to cheat the test. The collector further documented:

> [the appellant] pulled his pants down to mid-thigh and showed me the bag of urine strapped to his thigh admitting that he was trying to cheat the drug test due to potential traces of THC.

IAF, Tab 8 at 19.

I find the collector's statement reliable because it is a signed and certified statement, routinely provided in a Collection Questionnaire by a disinterested witness to a drug test, and corroborated by the voicemail messages the collector left for Aldrich on the same day as the random drug test. The collector's statement is further corroborated by appellant's subsequent admission to Aldrich that he had smoked marijuana since working at SEKI and had been trying to cheat the random drug test. *See Borninkhof*, 5 M.S.P.R. at 87.

Second, it is undisputed that the appellant admitted to Aldrich during an October 2022 meeting that he tried to cheat the random drug test because he had used marijuana. The appellant testified that he told Aldrich why he tried to cheat the random drug test and Aldrich testified to the same.

Third, the undisputed record evidence establishes that the appellant admitted, in writing, that he had used marijuana since starting work at SEKI and had even smoked marijuana, after work, with supervisor Heath. IAF, Tab 8 at 14; Tab 56 (Bennett, re-cross examination).

Based on the above undisputed record evidence, I find the agency proved specifications 1-3 by preponderant evidence, I sustain specifications 1-3, and I sustain Charge 4.

The agency proved nexus.

An adverse action may only be taken for such cause as will promote the efficiency of the service. An adverse action promotes the efficiency of the service, satisfying the nexus requirement, where the grounds for the action relate

to either the employee's ability to accomplish his duties satisfactorily or some other legitimate government interest. *See Fontes v. Department of Transportation*, 51 M.S.P.R. 655, 665 n.7 (1991). I find that there is a nexus between the appellant's ability to perform in a designated drug testing position and the efficiency of the service.

It is undisputed that the appellant's occupied a testing designated position and was subject to DOT rules because his position required a valid CDL. The result of a properly administered random drug test in September 2022 was "refusal to test," which itself resulted in the appellant being restricted from duties that required a CDL and/or safety sensitive duties until he completed a substance abuse program. The deciding official concluded that the appellant's admission to using a Schedule 1 controlled substance had a direct and negative relationship to remaining in a testing designated position. The deciding official testified that the appellant's deception at the random drug test eroded her confidence that he could follow the agency's policies and perform his testing designated position duties as expected. IAF, Tab 5 at 45; Tab 55 (Madello). Based on this evidence, I find the agency proved the nexus requirement.

The agency proved the removal penalty was reasonable.

Where, as here, I have sustained all the charged misconduct, I may mitigate the penalty only if it exceeds the tolerable limits of reasonableness or if the agency failed to weigh the relevant factors. *Raco v. Social Security Administration*, 117 M.S.P.R. 1, ¶ 13 (2011).

The factors I must consider, where appropriate, in reviewing the penalty for reasonableness are set forth in *Douglas v. Department of Veterans Administration,* 5 M.S.P.R. 280, 305-06 (1981). While not purporting to be exhaustive, the Board identified the following factors in *Douglas*: (1) the nature and seriousness of the offense, and its relation to the employee's duties, position, and responsibilities, including whether the offense was intentional or technical or

inadvertent, or was committed maliciously or for gain, or was frequently repeated; (2) the employee's job level and type of employment, including supervisory or fiduciary role, contacts with the public, and prominence of the position; (3) the employee's past disciplinary record; (4) the employee's past work record, including length of service, performance on the job, ability to get along with fellow workers, and dependability; (5) the effect of the offense upon the employee's ability to perform at a satisfactory level and its effect upon supervisors' confidence in the employee's ability to perform assigned duties; (6) consistency of the penalty with those imposed upon other employees for the same or similar offenses; (7) consistency of the penalty with any applicable agency table of penalties; (8) the notoriety of the offense or its impact upon the reputation of the agency; (9) the clarity with which the employee was on notice of any rules that were violated in committing the offense, or had been warned about the conduct in question; (10) potential for the employee's rehabilitation; (11) mitigating circumstances surrounding the offense such as unusual job tensions, personality problems, mental impairment, harassment or bad faith, malice or provocation on the part of others involved in the matter; and (12) the adequacy and effectiveness of alternative sanctions to deter such conduct in the future by the employee or others. *Id*. If the agency considered all of the relevant *Douglas* factors, I must give due deference to its decision. *Raco*, 117 M.S.P.R. 1, ¶ 13.

Jennifer Madello testified that she was the deciding official for the appellant's removal action. In her notice of decision and at hearing, Madello related some of the *Douglas* factors she considered prior to making her decision. *See* IAF, Tab 5 at 43-47; Tab 55 (Madello).

The deciding official reported that she considered the nature and seriousness of the charges, the fact that the appellant had no prior discipline, that he had a good work record and acceptable performance, the consistency of the penalty with other such offenses, the fact that the appellant knew the rules he was violating, and alternative sanctions. Madello testified that she had no confidence

that the appellant could uphold agency policies in the future, or that a lesser sanction would be adequate, noting that the policies provided the appellant with an opportunity to complete a substance abuse program and return to his duties, but the appellant failed to follow through. She reported that the appellant's deception during the random drug test also showed that he knew he had engaged in conduct that violated the workplace drug program and this eroded her confidence that he could follow the rules. IAF, Tab 55 (Madello).

Madello gave considerable thought to whether the appellant had presented sufficiently mitigating circumstances for his undisputed misconduct. She testified that the appellant's claims that his supervisor used drugs and coached him how to cheat a random drug test, if true, were mitigating circumstances. Madello ultimately decided that the severity of the charged misconduct, together with the appellant's clear notice of the law and agency policies relevant to his TDP position, outweighed any mitigating circumstances. The deciding official ultimately concluded that the appellant made a series of bad choices, from using marijuana while employed by the agency to trying to foil the random drug test. This balance led her to conclude that removal – rather than a suspension or a permanent reassignment to other duties – was the only appropriate penalty. IAF, Tab 55 (Madello, direct examination and cross-examination).

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service. I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal. For these reasons, I find the agency proved that the penalty it sustained was reasonable.

The appellant proved no affirmative defense that requires reversal of the Board's action.

Under 5 U.S.C. § 7701(c)(2), the Board is required to reverse the action of the agency, even where the agency has met its burden of proof, if the appellant shows that the decision was based on any prohibited personnel practice described in 5 U.S.C. § 2302(b), or shows that the decision was not in accordance with law. 5 C.F.R. § 1201.56(c). With respect to a claim of whistleblower retaliation, the Board will reverse the agency's action unless the agency shows by clear and convincing evidence that it would have taken the same action even absent the disclosure or activity. *Campbell v. Department of the Army*, 123 M.S.P.R. 674, ¶ 12 (2016).

The appellant demonstrated through the "knowledge/timing" test that his whistleblowing activity was a contributing factor in the agency's decision to remove him from his TDP position.

The appellant argued that he was removed based on retaliation for making protected disclosures about his supervisor's illegal conduct in the workplace. IAF, Tabs 36, 45, 46. An appellant may assert whistleblower retaliation as an affirmative defense to an agency action. *Campbell*, 123 M.S.P.R. 674, ¶ 11; *Shibuya v. Department of Agriculture*, 119 M.S.P.R. 537, ¶ 19 (2013); 5 C.F.R. § 1201.56(b)(2)(i)(C)). In such instances, "[o]nce the agency proves its adverse action case by [the applicable standard], the appellant must show by preponderant evidence that he made a disclosure under 5 U.S.C. § 2302(b)(8) and that the disclosure was a contributing factor in the agency's personnel action." *Shibuya*, 119 M.S.P.R. 573, ¶ 19.

Protected whistleblowing occurs when an employee makes a disclosure[11] they reasonably believe evidences any violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial or specific danger to public health and safety.  5 U.S.C. § 2302(b)(8)(A); *Chambers v. Department of the Interior*, 515 F.3d 1362, 1367 (Fed. Cir. 2008); *see also Webb v. Department of the Interior*, 122 M.S.P.R. 248, ¶ 10 n.3 (2015) (defining "gross mismanagement" as something more than "management decisions which are merely debatable"; "abuse of authority" as an allegation that a "federal official has arbitrarily or capriciously exercised power which has adversely affected the rights of any person or has resulted in personal gain or advantage to himself or to preferred other persons"; and "gross waste of funds" as "more than [a] debatable expenditure [that] is significantly out of proportion to the benefit reasonably expected to accrue to the government").

Protected whistleblowing also occurs, in relevant part, when an employee exercises an appeal, complaint, or grievance right that is made with regard to remedying a violation of law, rule, or regulation or other type of § 2302(b)(8) disclosure; or discloses information to the Inspector General or Special Counsel, in accordance with applicable provisions of law. 5 U.S.C. § 2302(b)(9)(A)(i), (C).

As discussed above, in November 2022 the appellant reported to upper management that his supervisor smoked marijuana at work, encouraged the appellant to smoke marijuana for pain management, and advised the appellant how to cheat a random drug test.  IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett).  I find the appellant proved he had a reasonable belief that his supervisor's conduct violated law, rule, and policy prohibiting the use of illegal

---

[11] A whistleblowing "disclosure" is defined at 5 U.S.C. § 2302(a)(2)(D) as a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences (i) any violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety.  5 U.S.C. § 2302(a)(2)(D).

drugs at work.  The appellant also reported his observations that Heath was an abusive manager to some of his staff.  IAF, Tab 45 at 115; Tab 54 (Aldrich); Tab 56 (Bennett).  Here too, I find that the appellant had a reasonable belief that the conduct he reported evidenced a violation of law, rule, or regulation addressing the standards of conduct for Federal employees and the agency's anti-harassment policy.  In February 2023, the appellant made these same disclosures to the agency's OIG; and in March 2024, to the OSC.  IAF, Tab 1 at 35-41; Tab 44 at 39-42.  Thus, I find the appellant proved by preponderant evidence that he engaged in whistleblowing activity under 5 U.S.C. § 2302(b)(9)(A)(i), (C).

Once an employee has proven that they made protected disclosures or engaged in protected activity, they must next show by a preponderance of the evidence that the protected disclosures or activity was a "contributing factor" in the personnel action on appeal.  "The most common way of proving the contributing factor element is the 'knowledge/timing test.'"  *Scoggins v. Department of the Army*, 123 M.S.P.R. 592, ¶ 21 (2016) (citations omitted).  Under the knowledge/timing test, "an appellant can prove that [the] disclosure was a contributing factor in a personnel action through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action."  *Id*.

An appellant can also show contributing factor by showing that the official who took the action had constructive knowledge of the protected disclosure or activity.  *Dorney v. Department of the Army*, 117 M.S.P.R. 480, ¶ 11 (2012).  The appellant may do so by "demonstrating that an individual with actual knowledge of the disclosure [or protected activity] influenced the official accused of taking the retaliatory action."  *Id*.  The Board has also held that if an appellant fails to satisfy the knowledge/timing test, the administrative judge must consider "other evidence, such as evidence pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was

personally directed at the proposing or deciding officials, and whether [those] individuals had a desire or motive to retaliate against the appellant." *Id.*, ¶ 15; *see also Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 65.

Based on the complete appeal record, I find no evidence that the proposing official had any awareness of the appellant's disclosures about his supervisor's on-the-job drug use or his OIG complaint. The proposal letter itself makes no express reference to the appellant's whistleblowing activity. *See* IAF, Tab 7 at 220-29. Reynolds did not testify at the hearing, but employee relations specialist Harris testified that Reynolds was selected to be the proposing official because he was outside the appellant's supervisory chain of command and thus a more suitable, impartial proposing official. IAF, Tab 54-6 (Harris). Harris helped Reynolds draft the notice of proposed removal and no one in the appellant's supervisory chain was involved. *Id.*

However, the deciding official testified that she was aware of the appellant's complaints about his immediate supervisor's drug use and harassment of other employees because he told her about it in his written response and discussed it during the oral response. IAF, Tab 6 at 77; Tab 55-3 (Madello, direct examination); Tab 55-4 (Madello, cross examination). This sufficiently demonstrates that the deciding official knew about the appellant's disclosures before she issued the decision removing him, which establishes the contributing factor element based on the "knowledge/timing" test. This means the burden shifts to the agency to prove by clear and convincing evidence that it would have taken the same action even if it had not known about the whistleblowing.

The agency proved by clear and convincing evidence it would have removed the appellant even if he had not made protected disclosures about workplace drug use and harassment.

Because the appellant has met his initial burden, the Board will reverse that action unless the agency shows by clear and convincing evidence that it would

have taken the same action even absent the disclosure or activity. "In determining whether the agency has met this burden, the Board will consider the following factors: (1) the strength of the agency's evidence in support of its action; (2) the existence and strength of any motive to retaliate on the part of the agency officials involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistleblowers, but who are otherwise similarly situated." *Campbell*, 123 M.S.P.R. 674, ¶ 12 (citing *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999)); *see also Whitmore v. Department of Labor*, 680 F.3d 1353, 1365 (Fed. Cir. 2012) (discussing *Carr* factors).

On *Carr* factor 1, the strength of the agency's evidence in support of its action, the Board and Federal Circuit have held that the strength of the agency's evidence is assessed based on the evidence available to it at the time it took the action. *Wilson v. Department of Veterans Affairs*, 2022 MSPB 7, ¶ 46 (discussing *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1372-73 (Fed. Cir. 2001)). As discussed above, the appellant does not dispute that he engaged in the conduct in Charge 1. His random drug test was reported as a "refusal to test" because he admitted he tried to substitute a bag of urine he purchased for his own urine.

The appellant also admitted he engaged in the conduct in Charge 4. Under the agency's workplace drug policy, PB 17-15, the use of illegal drugs, including marijuana, is not permissible. He admitted he tried to cheat the random drug test because of his marijuana use. The appellant's misconduct was directly related to his duties because he was in a TDP and operated heavy equipment, and knew that his TDP position and the workplace drug policy subjected him to special rules which he disregarded.

On *Carr* factor 2, the existence and strength of any motive to retaliate, there is no evidence that the deciding official was personally motivated to retaliate against the appellant. Madello was an experienced deciding official with

no personal knowledge of, or contact with, the appellant until she received his case file.   Madello testified candidly that the appellant told her about his whistleblowing activity in his responses but that she did not consider the information in her decision.   Instead, she relied on the fact that the appellant knew he was responsible for complying with the agency's policies prohibiting illegal drug use and requiring him to take random drug tests because he was in a TDP position, but made choices antithetical to his responsibilities.   I considered the entirety of Madello's testimony very credible.   She gave thorough and clear responses to questions from both parties, demonstrated a nuanced understanding of the process of deciding discipline, and was attentive both to the subject matter of the questions as well as potential privacy or confidentiality implications.   Her overall hearing demeanor demonstrated integrity and impartiality.   *See Hillen*, 35 M.S.P.R. at 458.

Finally, *Carr* factor 3 looks at evidence of similar actions against employees who are not whistleblowers. Here, Madello credibly testified that she was unaware of any employees who refused to test and were not removed.

I have considered the entirety of the record and weighed the credible evidence on each *Carr* factor together to determine whether the evidence is clear and convincing as a whole.   *Rickel v. Department of the Navy*, 31 F.4th 1358, 1366 (Fed. Cir. 2022).   With the evidence on *Carr* factors 1 and 2 weighing strongly in the agency's favor, I am satisfied that the agency would have removed the appellant had he not made protected disclosures about his supervisor's unlawful conduct.   Thus, I conclude that the agency met its clear and convincing burden and the removal action was not retaliation for whistleblowing.

The appellant failed to prove his disability discrimination claim.

The appellant alleged the agency's decision to remove him was disability discrimination based on the failure to provide him with a reasonable accommodation.   Specifically, he contends that the agency failed to accommodate

his deteriorating vision condition when it did not reassign him to a position at SEKI where he was not required to have or maintain a CDL.  IAF, Tab 22 at 9, 17; Tab 23 at 112; Tab 56 (Bennett).

As a Federal employee, the appellant's disability discrimination claim arises under the Rehabilitation Act of 1973.  However, the Equal Employment Opportunity Commission (EEOC) regulations implementing the Americans with Disabilities Act (ADA), as amended by the ADA Amendments Act (ADAAA), have been incorporated by reference into the Rehabilitation Act, and the Board applies them to determine whether there has been a Rehabilitation Act violation. *Desjardin v. U.S. Postal Service*, 2023 MSPB 6, ¶ 27 (citing *Pridgen v. Office of Management and Budget*, 2022 MSPB 31, ¶ 35).  Only an otherwise qualified individual with a disability is entitled to relief, whether the individual alleges disability discrimination based on a disparate treatment or reasonable accommodation theory.  *Id*. (citing *Haas v. Department of Homeland Security*, 2022 MSPB 36, ¶¶ 28-29).

The appellant may prove he has a disability by showing that he: (1) has a physical or mental impairment that substantially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment.  42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(g)(1), (2), (3). The definition of disability is construed in favor of broad coverage.  42 U.S.C. § 12102(4)(A).  A physical or mental impairment is any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, or any mental or psychological disorder.  29 C.F.R. § 1630.2(h).  The test for whether a disability substantially limits the ability of an individual to perform a major life activity is applied as compared to most people in the general population.  29 C.F.R. § 1630.2(j)(1)(ii).  Major life activities include but are not limited to activities such as caring for oneself, hearing, performing manual tasks, lifting, bending, and working, including the operation of a major bodily function. 29 C.F.R. § 1630.2(i).

At the time of his removal, the appellant had been diagnosed with aggressive inflammatory arthritis, an autoimmune disease, and glaucoma and pigment dispersion syndrome. IAF, Tab 7 at 93. Based on the medical evidence he provided, I find the appellant established by preponderant evidence that, at the time of his removal, he had a physical impairment(s) that substantially limited one or more major life activities and was an individual with a disability.

The Rehabilitation Act requires an agency to provide reasonable accommodation to a *qualified* individual with an actual disability or a record of a disability. 29 C.F.R. § 1630.2(o)(4) (emphasis added). To be a qualified employee with a disability who is entitled to a reasonable accommodation for his condition, the appellant must establish that, with or without reasonable accommodation, he can safely perform the essential functions of his position or a vacant position to which he could be reassigned. *Desjardin*, 2023 MSPB 6, ¶ 28.

Having found the appellant is a person with a disability as defined by 29 C.F.R. § 1630.2(g)(1)(i) based on his medical conditions, I now evaluate whether the appellant proved by preponderant evidence that he is a qualified individual with a disability.

In November 2022, the appellant informed Aldrich that his eyesight was deteriorating and he was concerned about his ability to safely perform work that required a CDL. IAF, Tab 54 (Aldrich); Tab 56 (Bennett). Before the conversation with Aldrich, the appellant tried to have conversations with Heath about his chronic physical pain, but Heath avoided the subject because he did not think that an employee's medical information was his business. IAF, Tab 54-2 (Heath); Tab 56 (Bennett).

However, the record is clear that the appellant admitted he was concerned he was going to lose his CDL due to a physical disability as early as October 2022. In a sworn affidavit dated August 31, 2023, the appellant stated that he could not operate heavy machinery, sit for long periods of time, climb, or lift and

move heavy objects.  IAF, Tab 7 at 94.  In a letter to Aldrich dated March 23, 2023, the appellant explained:

> My physical impairment is currently related to my vision, specifically my depth perception, preventing me from driving or operating heavy machinery at this time. This directly affects my ability to perform any part of my job duties related to use of my Class A CDL, operation of any heavy machinery or operation of any motor vehicle.

IAF, Tab 7 at 147-148 (March 23, 2023, medical information provided to Aldrich).

I acknowledge that the appellant's statements in March 2023 described his inability to perform his job duties "at this time."  However, the appellant provided no documentary or testimonial evidence that his vision impairment improved such that he could resume the full performance of his duties before the agency removed him.

Further, at no time during his employment did the appellant provide medical documentation to the agency that identified any accommodation that would have allowed the appellant to perform the essential functions of his position.  Nor did the appellant testify that he identified any such accommodations.  He candidly admitted that only a different job would allow him to continue working at SEKI with his disabilities.

Aldrich testified that during the November 2022 meeting with the appellant, the topic came up about other jobs at SEKI that did not require a CDL. The appellant confirmed it was a casual conversation and that he only formally requested reassignment to a different position in March 2023.  IAF, Tab 56 (Bennett); *see also* Tab 7 at 147-148.

It is undisputed that the appellant's position required a Class A CDL to operate heavy machinery.  Preponderant evidence shows that the appellant was no longer able perform those job duties due to his disabilities.  For these reasons, I

find that the appellant did not prove he was a qualified individual with a disability to whom the agency had to provide a reasonable accommodation.

In addition, as regards the appellant's request for reassignment, I find that the agency was not required to perform a job search before the appellant demonstrated to the agency that he was fit for continued employment. Aldrich testified that he told the appellant, in November 2022, that any job search was contingent on the appellant completing a SAP. The appellant was aware of this requirement as he admitted that Aldrich told him in October 2022 that he would likely be suspended for his conduct once he completed the SAP, but would face removal if he did not complete a SAP. IAF, Tab 56 (Bennett). I find it entirely reasonable for an employer to wait to conduct a search for a reassignment where an employee must first demonstrate his fitness for continued employment by, for example, following through on a mandatory SAP. *See, e.g., Gena C. v. Department of the Navy*, EEOC Appeal No. 2024002902, 2024 WL 2704605 (May 13, 2024) (An employer is not obligated to consider or grant an employee's request for accommodation that is raised for the first time after the employee has engaged in unacceptable conduct); *see also Elias R. v. Department of Veterans Affairs*, EEOC Appeal No. 2019001826, 2019 WL 7170891 (Nov. 20, 2019) (the EEOC has stated that "reasonable accommodation is always prospective" and thus an agency is not required to excuse past misconduct even if the misconduct was based on the employee's disability.).

Based on this record, I conclude that the appellant was not a qualified individual with a disability when the agency removed him. Further, the agency did not discriminate against the appellant by not reassigning him to a different position as a reasonable accommodation. The appellant's disability discrimination claim, based on failure to accommodate, thus fails.

Conclusion

After considering the evidence of record, I find that the removal action based on the sustained charges promotes the efficiency of the service. I further find that the agency has shown that it gave adequate consideration to the *Douglas* factors and thereafter properly exercised its managerial discretion in selecting the penalty of removal. Further, I find that the agency did not discriminate against the appellant based on a disability or retaliate against him for reporting supervisor misconduct. Accordingly, the agency's removal action is affirmed.

## DECISION

The agency's action is AFFIRMED.

FOR THE BOARD:                    _____
                                 Cynthia B. De Nardi
                                 Administrative Judge

### NOTICE TO PARTIES CONCERNING SETTLEMENT

The date that this initial decision becomes final, which is set forth below, is the last day that the parties may file a settlement agreement, but the administrative judge may vacate the initial decision in order to accept such an agreement into the record after that date. See 5 C.F.R. § 1201.112(a)(4).

### NOTICE TO APPELLANT

This initial decision will become final on **October 23, 2025**, unless a petition for review is filed by that date. This is an important date because it is usually the last day on which you can file a petition for review with the Board. Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision. The date that the petitioner receives

the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.  The date on which the initial decision becomes final also controls when you can file a petition for review with one of the authorities discussed in the "Notice of Appeal Rights" section, below. The paragraphs that follow tell you how and when to file with the Board or one of those authorities. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

## BOARD REVIEW

You may request Board review of this initial decision by filing a petition for review.

Your petition must state your objections to the initial decision, including all of your legal and factual arguments, and must be supported by references to applicable laws or regulations and by specific references to the record.  You must file it with:

> The Clerk of the Board
> Merit Systems Protection Board
> 1615 M Street, NW.
> Washington, DC 20419

A petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing.  A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website  (https://e-appeal.mspb.gov/).

### Criteria for Granting a Petition for Review

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition for review. Situations in which the Board may grant a petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words. A reply to a response to a petition for review is limited to 15 pages or 3750 words. A party relying on word count to adhere to the length limitation must include certification of the word count with their pleading. Argument formatted such that the length of the pleading cannot be determined may be rejected. Computer generated and typed pleadings must use no less than 12-point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents,

table of authorities, attachments, and certificate of service. Length limitations may not be circumvented by including argument in attachments. Failure to comply with length limitations, after sufficient opportunity to comply, may lead to dismissal of the petition for review. A request for leave to file a pleading that exceeds the limitations must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length.

If you file a petition for review, you should not include documents that were part of the record below, as the entire administrative record will be available to the Board.  Any petition for review must be filed within 35 days after the date of issuance of the initial decision or, if the petitioner shows that the initial decision was received more than 5 days after the date of issuance, within 30 days after the date the petitioner received the initial decision.  The date that the petitioner receives the initial decision is determined according to the standard set forth at § 1201.22(b)(3), pertaining to an appellant's receipt of an agency decision. If the petitioner is represented, the 30-day time period begins to run upon receipt of the initial decision by either the representative or the petitioner, whichever comes first.

Any response to a petition for review must be filed within 25 days after the date of service of the petition. Any reply to a response to a petition for review must be filed within 10 days after the date of service of the response to the petition for review. The Board's regulation at 5 C.F.R. § 1201.23 governs the computation of time.

## NOTICE OF LACK OF QUORUM

While administrative judges may continue to issue initial decisions like this one, the Board must have two or more members (known as a quorum) to issue

decisions on petitions for review (PFR). See 5 U.S.C. § 1201; 5 C.F.R. § 1200.3(a), (e). Currently, the Board only has one member, so it is unable to issue any final Board decisions on PFRs. This means that while parties may still file PFRs on initial decisions during this time, no decisions on them will be issued until at least two members are in place, thereby restoring the Board's quorum. Importantly, the absence of a quorum does not extend any deadlines for filing a PFR. Anyone filing a PFR must still meet the deadline outlined above.

## NOTICE TO AGENCY/INTERVENOR

Any party to the proceeding, the Director of the Office of Personnel Management (OPM), or the Special Counsel (under 5 U.S.C. 1212(c)) may file a petition for review. Each party is limited to filing a single petition for review, response to a petition for review, and reply to a response to a petition for review. A petition for review filed by an agency should address the agency's compliance with any interim relief requirements and should contain a certification, as set forth at 5 C.F.R. § 1201.116(a).

## NOTICE OF APPEAL RIGHTS

You may obtain review of this initial decision only after it becomes final, as explained in the "Notice to Appellant" section above. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this decision when it becomes final, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the

applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case.  If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general.**  As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date this decision becomes final.  5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

> U.S. Court of Appeals
> for the Federal Circuit
> 717 Madison Place, N.W.
> Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2)** **Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you <u>only</u> if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—<u>including a disposition of your discrimination claims</u>—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** <u>after this decision becomes final</u> under the rules set out in the Notice to Appellant section, above. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. 420 (2017). If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of <u>your discrimination claims only, excluding all other issues</u>. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** <u>after this decision becomes final</u> as explained above. 5 U.S.C. § 7702(b)(1).

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C.  20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C.  20507

**(3)    Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012**.  This option applies to you <u>only</u> if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D).  If so, and your judicial petition for review "raises no challenge to the Board's disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8) or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must <u>receive</u> your petition for review within **60 days** of <u>the date this decision becomes final</u> under the rules set out in the Notice to Appellant section, above.  5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C.  20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov.  Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation

for Merit Systems Protection Board appellants before the Federal Circuit.  The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx

CERTIFICATE OF SERVICE

I certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

### Appellant

U.S. Mail

Scott Bennett
550 Dexter Ave
Porterville, California 93257

### Appellant Representative

Electronic Service

Dawn Bennett
Served on email address registered with MSPB

### Agency Representative

Electronic Service

Gregory Thornton
Served on email address registered with MSPB

### Agency Representative

Electronic Service

Julia Zukina
Served on email address registered with MSPB

| 09/18/2025 | *Jacob L Jones* |
|---|---|
| (Date) | Jacob L Jones |
| | Paralegal Specialist |

SAppx39

**WARNING: AT LEAST ONE DOCUMENT COULD NOT BE INCLUDED!**
**You were not billed for these documents.**
**Please see below.**

## Selected docket entries for case 26–1289

Generated: 06/30/2026 11:20:43

| Filed | Document Description | Page | Docket Text |
|---|---|---|---|
| 12/29/2025 | 1 | | Appeal docketed. Received: 12/22/2025. [1137060] Fee/IFP is due on 01/12/2026. 15(c) is due on 01/12/2026. Entry of Appearance is due on 01/12/2026. Certified List is due on 02/09/2026. [IMH] |
| | 1 Notice of Docketing | 3 | |
| | 1 Agency Case Docketed | 7 | |
| 01/12/2026 | 2 Certified List | 47 | Certified list received. Service: 01/09/2026 by email. Refer to Fed. Cir. R. 31 for calculating brief deadlines from service of the certified list. [1139735] [IMH] |
| 01/12/2026 | 3 **(RESTRICTED)** Document(s) not accessible | | MOTION of Petitioner Mr. Scott William Bennett for leave to proceed in Forma Pauperis. Service: 01/12/2026 by email. [1140002] [26–1289] [Scott Bennett] |
| 01/12/2026 | 4 Entry of Appearance | 91 | MODIFIED ENTRY: Notice of Unrepresented Person Appearance and Consent to Electronic Filing and Service for Petitioner Mr. Scott William Bennett. Service: 01/12/2026 by email. [1140011]––[Edited 01/12/2026 by IMH – Reason: to correct filing event] [Scott Bennett] |
| 01/15/2026 | 5 Entry of Appearance | 93 | Entry of Appearance for Stephen J. Smith as counsel for Respondent Interior. Service: 01/15/2026 by email. [1140882] [26–1289] [Stephen Smith] |
| 01/22/2026 | 6 | | ORDER The motion is held in abeyance. Mr. Bennett must file his Federal Circuit Form 10 (enclosed) within 21 days of the date of entry of this order. Failure to do so may result in dismissal of this petition for review. See Fed. Cir. R. 15(c)(3). Service as of this date by the Clerk of Court. [1142267] [LMS] |
| | 6 Clerk Order | 94 | |
| | 6 supporting document **DOCUMENT COULD NOT BE RETRIEVED!** | | |
| 01/22/2026 | 7 Statement Concerning Discrimination – FCR 15(c) | 96 | Statement Concerning Discrimination pursuant to Fed. Cir. R. 15(c) for Petitioner Mr. Scott William Bennett. Service: 01/22/2026 by email. [1142434] [26–1289] [Scott Bennett] |
| 03/12/2026 | 8 Court Order | 99 | ORDER filed. Within 30 days from the date of entry of this order, the parties are directed to address this court's jurisdiction, including whether this petition for review should be dismissed or transferred, and, if transferred, identify an appropriate court. The motion for leave to proceed in forma pauperis [3] is held in abeyance, and these proceedings otherwise are stayed. (Per Curiam). Service as of this date by the Clerk of Court. [1152737] [NL] |
| 04/13/2026 | 9 | | RESPONSE of Respondent Interior to Doc. No. [8], [8], [8]. Service: 04/13/2026 by email. [1159188] [26–1289] [Stephen Smith] |
| | 9 Response to Court | 101 | |

| | | | |
|---|---|---|---|
| | 9 Supplemental Appendix | 113 | |
| 06/30/2026 | 10 Dispositive Court Order | 152 | ORDER filed transferring this matter and all filings to the United States District Court for the Eastern District of California pursuant to 28 U.S.C. § 1631. (Per Curiam). Service as of this date by the Clerk of Court. [1176642] [LMS] |